**Sam SHOCHAT, Phoebe Shochat, Isidore Shochat and Rose Shochat, Plaintiffs,**

v.

**Stanley WEISZ, Defendant.**

**No. CV 87–6935 (ADS).**

United States District Court, E.D. New York.

June 23, 1992.

Haas, Greenstein, Sims, Cohen & Gerstein, New York City (Robert I. Cantor, Lisa A. Wellman, of counsel), for plaintiffs.

Michael Dennis, Saul Weinstein, Garden City, N.Y., for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This is a securities fraud action to recover damages by investors against their accountant as a result of certain investments in tax shelters.

## THE COMPLAINT

The complaint contains two causes of action. The first cause is based on alleged "affirmative misrepresentations and intentional omissions to plaintiffs concerning the advisability of their acquiring the ... securities and concerning his (defendant's) actively representing plaintiffs in order to obtain a settlement with the Internal Revenue Service favorable to plaintiffs" (Complaint ¶ 62). The plaintiffs allege that the stated "affirmative misrepresentation and intentional omissions ... constitute violations of the Securities and Exchange Act of 1934 and Rule 10b–5 of the Rules of the Securities Exchange Commission."

Perusing the complaint, the Court notes the plaintiffs' allegation that they are "inexpert and unsophisticated investors ... relying totally on defendant's advice with respect to making investments in tax shelters" (Complaint ¶ 7). The complaint alleges the following affirmative misrepresentations or omissions, with regard to five different tax shelter investments, namely,

Wind Energy, Darby Coal, Sharon Biomedical, MF Computer and Lithographs:

1. *As to Wind Energy:*

In the category of "affirmative misrepresentation," the plaintiffs claim that the defendant held out one Louis Ladimir to be the Chairman, sole director and officer of Wind Energy, which created the false image of an active research and development business; that there was a reasonable expectation that Wind Energy would generate economic benefits other than just tax write-offs.

As to "omissions," the plaintiffs contend that the defendant failed to disclose the fact that Ladimir's signature on a contract to perform research and development was a forgery; that Wind Energy lacked the criteria necessary to qualify as a legitimate tax shelter; that deductions taken on the investors' federal tax returns had no reasonable chance of being allowed by the Internal Revenue Service ("IRS") (*see* Complaint ¶¶ 20, 21, 22). The latter two allegations form a common thread involving all the tax shelters.

2. *As to Darby Coal:*

That the defendant failed to advise the investors that the Darby Coal offering plan was devoid of any business plan or opinion on which an investor could base an informed decision; that the Darby Coal investment patently lacked the criteria then necessary to qualify as a tax shelter and that deductions taken by its investors "had absolutely no reasonable chance of being allowed by the Internal Revenue Service"; that the defendant was aware that the offering constituted a securities law violation of Rule 10b–5 (*see* Complaint ¶¶ 29, 34).

3. *As to Sharon Biomedical:*

That the defendant represented that investment in Sharon Biomedical would allow the plaintiffs to "legitimately take certain deductions on their federal income tax returns"; that the defendant failed to disclose that Sharon Biomedical patently lacked the criteria then necessary to qualify as a legitimate tax shelter and that

deductions had "absolutely no reasonable chance of being allowed" by the IRS; that the defendant was aware that the offering constituted a securities law violation of Rule 10b–5 (*see* Complaint ¶¶ 35, 36, 41).

4. *As to MF Computer:*

That the defendant affirmatively represented that investment in MF Computer would allow plaintiffs to "legitimately" take deductions on their federal income tax returns; that defendant failed to advise the plaintiffs that MF Computer lacked the criteria then necessary to qualify as a legitimate tax shelter and that deductions taken had "absolutely" no reasonable chance of being allowed by the IRS; that the defendant was aware the offering constituted a securities law violation of Rule 10b–5 (*see* Complaint ¶¶ 42, 43, 48).

5. *As to Lithographs:*

That the defendant affirmatively represented to plaintiffs Sam and Phoebe Shochat that he could create a tax shelter tailored to sell the works of a certain artist and allow investors to take "legitimate" deductions on their tax returns; that defendant failed to advise said plaintiffs that Lithographs "patently" lacked the criteria necessary to qualify as a "legitimate" tax shelter and that deductions taken had "absolutely" no chance of being allowed by the IRS (*see* Complaint ¶¶ 49, 52).

The second cause of action repeated the same allegations in the nature of a New York State common law fraud cause of action.

## SECURITIES FRAUD—THE STATUTE AND RULE—CLAIMS UNDER SECTION 10(b) AND RULE 10b–5.

Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any

facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, promulgated by the Securities and Exchange Commission in 1948 pursuant to section 10(b) (reprinted in 7 C.F.R. § 240.10b–5 [1990]), provides as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

To establish a claim under section 10(b) or Rule 10b–5, the plaintiffs must prove the following essential elements:

"(1) damage to plaintiff, (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud, (3) made with scienter (i.e., an intent to deceive, manipulate or defraud, or possibly with reckless disregard), (4) in connection with the purchase or sale of securities, and (5) furthered by defendant's use of the mails or any facility of a national securities exchange" (*Royal Am. Manag-*

*ers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1015 [2d Cir.1989]).

In sum, the plaintiffs must prove that "in connection with the purchase ... of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused him injury" (*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 [2d Cir.1985]; *see also Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 961–62 [2d Cir.1987]; *A. Burton White, M.D., P.C. v. Beer,* 679 F.Supp. 207, 211–12 [E.D.N.Y.1988]).

### THE TRIAL

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (*see also Colonial Exchange Ltd. Partnership v. Continental Casualty,* 923 F.2d 257 [2d Cir.1991]).

During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

SAMUEL SHOCHAT ("the plaintiff" or "SHOCHAT") is a successful businessman and the President of Woodbury Automotive Warehouse, Inc., an auto parts business serving the tri-state area. He is an eighty percent stockholder in Woodbury Automotive Warehouse, Inc., in addition to owning four other auto parts companies. In 1977 or 1978, some of the years at issue, the annual gross sales of his businesses was approximately ten million dollars. In 1974, with his business growing, the plaintiff retained the defendant STANLEY WEISZ ("the defendant" or "WEISZ") as the accountant for him and the plaintiff ISIDORE SHOCHAT, his father, as well as for their businesses.

The plaintiff, his father and the defendant usually met late in the year to discuss year-end business and personal taxes. In 1977, their fiscal year ended on September 30th. The subject of tax shelters was first discussed during the 1977 meeting. With regard to the personal income tax liability of the plaintiff and his father, the defen-

dant said he sold tax shelters to some of his clients. The defendant mentioned Darby Coal as a good investment because oil was difficult to obtain at that time and coal was "reinvented." Shochat testified that the defendant told them that Darby Coal was a "good shelter to defer taxes—he recommended it and we bought it."

At the time of the 1977 meeting, the plaintiff and his father asked the defendant a number of questions because they were concerned "if it was legal and approved by the IRS." They were assured by the defendant that Darby was "viable" and that "he wouldn't put us in anything not approved by the IRS." The plaintiff testified that he saw no literature at that time.

In November 1977, the parties had another meeting and the plaintiffs asked additional questions, at which time "he [Weisz] satisfied us." Shochat gave the defendant his checkbook and the defendant wrote out a check for $16,500 and Shochat signed it. At that time, the defendant stated that there was "definitely a very good chance to make money due to the oil shortage." He also told the plaintiffs what tax deductions there would be and that the company was "very viable." However, Shochat conceded that the defendant "made no guarantee."

Shochat received written data from Darby Coal by mail in early 1978. He saw no documents prior to delivering his check to the defendant. However, he conceded signing a four page non-negotiable promissory note which was dated November 20, 1977.

In November 1978, the parties again had a year-end tax planning conference at the defendant's office, at which time they discussed the subject of a second shelter, MF Computer. The defendant "suggested we go into a company MF similar to Darby." Simultaneously, Woodbury Automotive was in the market to purchase a computer system. The defendant said that they could combine their purchase of a tax shelter with the purchase of a computer system "and we can get tax deductions in the future." This was supposed to be a tax shelter designed for Shochat. At that time, the defendant mentioned the name

Myron Friedman as being the MF in MF Computer. The plaintiff received no documents regarding MF Computer.

However, the defendant signed two types of checks, including a corporate check to purchase a computer system from Radex Systems. Between November 1978 and September 1981, the defendant also drew four personal checks to the order of MF Computer, as follows:

| | |
|---|---|
| November 1978 | $10,000 |
| March 1979 | 10,000 |
| November 1979 | 2,000 |
| September 1981 | 5,000 |
| TOTAL: | $27,000 |

As in the Darby Coal transaction, the plaintiffs had conversations with the defendant as to the viability of IRS approval. The defendant assured them that "this was a very viable situation" and that he did "the same thing with other clients." Shochat testified that "he wouldn't put it in anything that wasn't right." In both of these transactions, Shochat spoke to no one except Weisz.

The third tax shelter was Lithographs, which involved art work. The defendant told Shochat that he could put an art works tax shelter together for him. Although he received no documents, the plaintiff made the following investments in Lithographs:

| | |
|---|---|
| July 1979 | $1588 |
| May 1980 | 2000 |
| TOTAL | $3588 |

With regard to the Lithographs tax shelter, apparently Shochat himself initiated this transaction. In fact, he introduced artist Ronald Wolotsky, the husband of his wife's niece, to the defendant. Although Shochat testified that the defendant "created" this shelter, the Court does not credit this testimony.

The fourth tax shelter was Wind Energy. This shelter was first discussed in December 1979 as a "last minute situation." The defendant came to Shochat's office and told him that time was of the essence and that he needed a tax shelter with regard to his 1979 income. The defendant informed Shochat that this shelter was a great concept, involving windmills, energy and pow-

er. The defendant stated that it was viable, reduced pollution and was inexpensive. The defendant advised him that this shelter "had a strong possibility of being very successful."

In December 1979, Shochat gave the defendant a $15,000 check and was in turn given a prospectus.

The Court notes that Shochat invested in another tax shelter called Wayland Properties, but the plaintiff apparently had no problems with that shelter.

In December 1980, the plaintiff invested in the fifth and last tax shelter at issue, known as Sharon Biomedical. In their meeting at that time, the defendant advised Shochat that he needed a tax shelter because of his income level. The defendant stated that Sharon was a "good viable business." Without documentation, Shochat invested $13,500 in Sharon Biomedical in December 1980.

In 1981, the plaintiff received a notice by mail from the IRS that the five shelters were not acceptable. When he received the notice concerning the Darby Coal purchase, Shochat called the defendant who told him he was familiar with the notice. The defendant told Shochat that his people were working with the IRS and "it will be turned around." On January 12, 1982, Shochat was informed of a disallowance of MF Computer. The plaintiff met with an IRS Special Agent at the defendant's office. The defendant was to provide the Agent with back-up paperwork for an evaluation of MF Computer as well as a user's guide. Ultimately, MF Computer was also disallowed by the IRS.

In 1982, the plaintiff and his companies changed accountants and retained a firm called Lazar, Levine & Co ("Lazar"). According to Shochat, even after he was replaced as the plaintiff's accountant, Weisz agreed to handle the IRS problems related to Darby Coal and MF Computer. Some time later, Lazar negotiated settlements with the IRS "where IRS allowed me cash settlements."

On cross-examination, it became very apparent that the plaintiff was clearly and emphatically warned to be cautious concerning these investments. In a plethora of documents, the plaintiffs were forcefully given express notice that these tax shelters were high-risk investments which could produce only uncertain tax benefits.

Plaintiff's Exhibit 5 is the Wind Energy "Confidential Purchase Memorandum" which states, on the second page in large dark capital letters, the following information:

"THIS PROPOSED SALE INVOLVES A HIGH DEGREE OF RISK, INCLUDING RISKS AS TO THE TAX STATUS OF THIS TRANSACTION, POTENTIAL CONFLICTS OF INTEREST AND OTHER RISKS DESCRIBED HEREIN UNDER 'RISK FACTORS.'

THE TRANSACTIONS CONTEMPLATED IN THIS OFFERING HAVE TAX EFFECTS WHICH ARE NOT SUSCEPTIBLE TO PRECISE PREDICTION."

\*     \*     \*     \*     \*     \*

"NEITHER THE COMPANY, NOR ANY OFFICER, EMPLOYEE, ADVISOR OR REPRESENTATIVE OF ANY PERSON FURNISHING SERVICES TO OR ON BEHALF OF THE COMPANY ASSUMES ANY RESPONSIBILITY FOR THE TAX CONSEQUENCES OF THIS TRANSACTION TO A PURCHASE. THE INTERNAL REVENUE SERVICE may disallow PART OR all OF CERTAIN deductions ANTICIPATED TO BE CLAIM BY THE COMPANY, INCLUDING THE DEDUCTIONS FOR RESEARCH AND DEVELOPMENT AND THE DEPRECIATION ALLOWANCES CONTEMPLATED THEREBY, IN WHICH EVENT THE INVESTOR WOULD NOT RECEIVE THE ANTICIPATED TAX BENEFITS RESULTING FROM PURCHASE OF THE STOCK. IN THE EVENT THAT THE OPTION PAYMENT WHICH REPRESENTS A PORTION OF THE INVESTORS TAX BASIS IS REALIZED AS INCOME BY THE INVESTOR, SUBSTANTIAL ORDINARY INCOME, BUT NO CASH, MAY BE REALIZED WHICH WILL BE TAXABLE TO THE INVESTOR AT UNEARNED INCOME RATES. (SEE

*'FEDERAL INCOME TAX CONSE-QUENCES'* AND THE OPINION ATTACHED HERETO)."

Also, on page three, the following is stated in large dark capital letters, including portions that are underlined:

"PURCHASE OF THE STOCK INVOLVES A HIGH DEGREE OF RISK AND IS NOT RECOMMENDED FOR PROPOSED INVESTORS WHO MARGINAL FEDERAL INCOME TAX BRACKET, BEFORE TAKING INTO ACCOUNT THE LOSSES INCURRED AS A RESULT OF SUCH PURCHASE, IS NOT AT LEAST FIFTY PERCENT (50%) OR FOR PROPOSED INVESTORS WHO HAVE SIGNIFICANT TAX PREFERENCE INCOME. (SEE, 'RISK FACTORS'). *THE PURCHASE OF THE STOCK OFFERED HEREBY SHOULD BE CONSIDERED ONLY BY A PERSON WHO CAN AFFORD TOTAL LOSS OF HIS PURCHASE PRICE.* NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS CONCERNING THIS OFFERING OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM, AND IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON."

Under the classification "RISK FACTORS," the following additional warnings were set forth:

"A prospective investor should carefully consider the following Risk Factors prior to the purchase of stock in the Company.

A. *Competition in the Energy Industry*

Due to the competitive nature of the energy industry, with respect to both fossil fuels and alternate energy sources, the profit potential of the Company's License is highly speculative and is subject to a *high degree of risk.*

\* \* \* \* \* \*

It should also be noted that the alternate energy industry is still in its infancy and there is no accurate way to ascertain the actual available market for any commercial application of the Company's License.

\* \* \* \* \* \*

*If any investor feels that the information the Establishment has declined to furnish is material to an investment decision, he should not purchase the Company's stock.*

\* \* \* \* \* \*

*There can be no assurance that the Establishment will be able to develop commercially viable uses for the Company's License, in which case the Company would be required to discontinue business.*

\* \* \* \* \* \*

F. *Tax Factors.*

\* \* \* \* \* \*

1. The favorable tax results which may be anticipated by the Purchaser will be dependent upon a number of factors, none of which is presently susceptible to a definite and favorable resolution, and all of which are subject to the challenge by the Internal Revenue Service (the "Service"), including:

\* \* \* \* \* \*

c. The propriety of the Company's deductions for research and development; and

\* \* \* \* \* \*

Any such challenge, if successful, would result in adverse tax consequences and could result in the Purchaser's paying income tax deficiencies for years in which certain losses were deducted."

The Court notes that these warnings go to the heart of the plaintiffs' fraud case.

As to the Darby Coal (Regal Energy Corp.) investment, Shochat testified that he did not get the subscription agreement (Defendant's Exh. B) until a few months after he made the investment. However, the plaintiff's check to Darby Coal for $16,500 is dated November 7, 1977 (Defendant's Exh. D) and the acceptance by the corporation contained in the subscription agreement is dated November 9, 1977 (*see* p. 7 of Defendant's Exh. B). Shochat conceded

that he signed the last two pages as the "investor." The Darby Coal subscription agreement contains the following significant and material language:

"(a) The Investor ... is familiar with and understands the Memorandum and the Exhibits and is aware of the high degree of risk associated with an investment in the working Interests. The Investor is also aware that an amount equal to 10% of his subscription payment, if and to the extent accepted, may be paid to persons who assisted in the sale of Working Interests to him.

(b) The Investor has a personal net worth (exclusive of the value of his home, furnishings and automobiles) in excess of $250,000 and for the taxable year 1976 the Investor had, or for the current taxable year the Investor anticipates that he will have, income a portion of which was, or will be, subject to federal income tax at a marginal rate of 50% or more.

(c) The Investor is a person who is able to bear the economic risks, including a total loss, of an investment in the working Interests.

(i) The Investor and his Offeree Representative recognize that any Federal income tax benefits which may be available to the Investor may be adversely affected for the reasons set forth in the Memorandum and the Tax Opinion annexed thereto as Exhibit C, and the Investor represents that he has read said Tax Opinion in its entirety, and understands the possible investment and tax consequences of investing in the working Interests." (Pages 2, 4).

■ The plaintiff conceded that these words "were a warning" of the uncertainty of tax benefits. His explanations that the defendant assured him that these unequivocal, ominous warnings were "boilerplate" statements and "didn't mean anything," cannot obviate these clear serious signals to an experienced businessman. The plaintiff's excuse that he did not read some of the papers is, of course, legally unacceptable. Generally, one who signs a written instrument is conclusively bound by its

terms (*see Hoffman v. National Equipment Rental Ltd.*, 643 F.2d 987, 991 [4th Cir.1981] ["Ignorance due to failure to read is no excuse in New York"]; *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 170 N.E. 530 [1930]; *Gervasio v. DiNapoli*, 134 A.D.2d 235, 520 N.Y.S.2d 430 [2d Dept.1987]; *Chrysler Credit Corp. v. Kosal*, 132 A.D.2d 686, 518 N.Y.S.2d 162 [2d Dept. 1987]; *Newmark & Lewis, Inc. v. Olim Realty Corp.*, 109 A.D.2d 737, 486 N.Y.S.2d 55 [2d Dept.1985]; *Lum v. Antonelli*, 102 A.D.2d 258, 476 N.Y.S.2d 921 [2d Dept.1984] *aff'd* 64 N.Y.2d 1158, 490 N.Y.S.2d 733, 480 N.E.2d 347 [1985] ). In this case, Shochat is bound by the terms of the damaging documents in evidence.

Not only is the plaintiff bound by the provisions of the documents he signed by operation of law, but, in this case, the plaintiff conceded that "he was not misled ...," he just did not feel like reading "some of the documents," and, indeed, he stated that he did "glance over" other documents.

With regard to the five tax shelters at issue, it appears that the plaintiff took substantial deductions on his personal income tax returns. As to Darby Coal, with an investment of $16,500, Shochat took "losses" or deductions of $65,319 in his 1977 personal income; $3,669 in his 1978 personal income and another $3,669 in his 1979 personal income. As to Sharon Biomedical, Shochat invested $13,500 and took deductions of $52,000. As to MF Computer, Shochat invested $27,000 and got a $60,000 tax credit. As to Lithographs, Shochat invested $3,588 and got an investment tax credit of $1,540.

The Court views with skepticism the testimony by Shochat that, in addition to the substantial tax benefits he gained with regard to these highly speculative investments, he expected to make a profit on all the tax shelters. On the contrary, the Court finds that the plaintiffs invested in these tax shelters primarily to obtain immediate and substantial tax deductions so as to reduce their income tax liability. The Court further finds that the "profit motive," if any, was minimal, and was not the

reason the plaintiffs invested in the tax shelters at issue. The Court finds that, at the time the plaintiffs made their investments, they well knew that the investments were speculative, risky and probably could result in zero profit or return on their investments. As plaintiff Isidore Shochat stated on the stand, "we were to invest 'X' dollars and get large write-offs and *possibly* make money on the investment" (emphasis added). The Court credits that testimony.

The Court also finds that even if the plaintiffs did not receive the documents containing the clear and express warnings at the time of their initial investment in Darby Coal in 1977, they certainly had received similar warning documents prior to their later investments. For example, Shochat purchased Sharon Biomedical in 1980, almost three years after he had been given the documentary warnings in Darby Coal.

With regard to the IRS investigation of the tax shelters, Shochat testified that he asked the defendant to assist in this endeavor and that the defendant said "he was working on it and would definitely take care of it." This is one of the alleged misrepresentations in the plaintiffs' securities fraud cause of action. The Court notes, however, that in 1983, when the IRS investigation really materialized, the plaintiffs had already retained the accounting firm of Lazar, Levine & Co.

Further, as to the items set forth in Plaintiff's Exh. 13, an Information Document Request from Agent Letsinger, dated June 16, 1983, the plaintiff stated that the defendant said he would take care of it. However, Shochat testified that on or about April 29, 1985, he first learned of an IRS disallowance, he mailed the document to Lazar, Levine & Co. The Court finds that it was Lazar, Levine & Co., and not the defendant, who represented the plaintiffs in the negotiations with the IRS. Therefore, the failure of the defendant to represent the plaintiffs in their dealings with the IRS cannot form the basis of any fraud liability.

LOUIS C. LADIMIR is a self-employed accountant. Between 1969 and 1983 he was employed by the defendant as a junior accountant. Ladimir testified that in the mid–1970s, "a lot of clients" went into tax shelters, but he could not say that the defendant encouraged them to do so.

In 1980, Ladimir learned of the Wind Energy tax shelter when the defendant asked him to sign a tax return or some other corporate document, as President. In fact, he said, he was the nominal President of Wind Energy although he had no knowledge of or involvement with the business of the shelter. He was shown a Wind Energy document dated December 28, 1979 which contained a signature not his (*see* Plaintiffs' Exh. 14). He learned that his name was being used on documents without his consent in connection with companies called Mohegan Electronics and Oswego Electronics (*see* Plaintiffs' Exhs. 15 and 16). Ladimir confronted the defendant with respect to his unauthorized use of his name, but the witness did not recall what the defendant said.

Ladimir testified that more than fifty clients of the defendant were involved in tax shelters. Four of these clients invested in Wind Energy.

On cross-examination, Ladimir conceded that the defendant asked him to serve as President of Wind Energy and, in return, he received fifty shares of stock in the company. In addition, at about that time, Ladimir received a $2,000 check from the defendant which he contends was received by him as an employee's bonus. Further, Ladimir testified that he did not know if the defendant was a promoter of Wind Energy or any other tax shelter. In addition, he stated that he never asked the defendant's clients to buy tax shelters and was never present during such purchases. The Court finds that Ladimir was a suspicious, guarded and somewhat evasive witness.

ISIDORE SHOCHAT, the father of Samuel, was a businessman for forty-five years, but has been retired from the auto parts business since 1985. He also engaged in conversations with the defendant

as to tax shelters. He and his son would meet in the defendant's office several times a year to go over the financial statements. During those meetings, the defendant recommended that they go into tax shelters "as we were showing nice profits." The defendant stated that the tax shelters were a "good write-off." Isidore had heard and read about tax shelters, which he believed were devices to "save money on taxes for corporations and individuals."

The Court finds, crediting the testimony of Isidore Shochat, that the advice given to the plaintiffs by the defendant about investing in tax shelters was the normal, usual and routine advice by an accountant to his clients with regard to advising them as to the legal methods of reducing their tax liability. This type of "tax shelter" advice was especially appropriate in the late 1970s, when tax shelters were apparently a popular and accepted method of deferring tax liability.

Isidore Shochat's view of tax shelters was expressed by his statement that "we were to invest "X" dollars and get large write-offs and *possibly* make money on the investment." He was given literature to read by the defendant. The Court finds this testimony to be true, namely, "we were to invest "X" dollars and get large write-offs and *possibly* make money on the investment."

As to Wind Energy, Isidore Shochat testified that he invested in the company on the advice of the defendant that it was a "good write-off and investment." The defendant never told the Shochats that his firm would be supplying accounting services to Wind Energy or that he was a partner or promoter and was paid fees by the promoter. The same is true with regard to their investments in Sharon Biomedical.

Isidore Shochat invested in tax shelters, as follows:

1977   Master Recording; $10,000
       Disallowed by the IRS. This shelter is not involved in this lawsuit.
1979   Wind Energy; $23,000
       Disallowed by the IRS in its entirety.
1980   Sharon Biomedical; $13,500
       Disallowed by the IRS in its entirety.

On cross-examination, Isidore Shochat did not recall if he ever contacted the defendant after the IRS disallowances. The Court notes that this is contrary to the allegations in the complaint that the plaintiffs retained the defendant to represent them in negotiations with the IRS (*see* Complaint ¶ 55). Remarkably, as a result of his purchase of these tax shelters, Isidore Shochat took the following deductions in his tax returns:

*Wind Energy*—for his $23,000 investment, he took $97,104 in total deductions.

*Sharon Biomedical*—for his $13,500 investment, he took $52,000 in total deductions.

As to all of these deductions, Isidore Shochat testified that he was not aware the IRS could disallow the deductions. The Court finds this testimony to be incredible. For an experienced businessman to believe that $97,000 in deductions in exchange for a $23,000 investment was not a "risky proposition" is beyond belief. Even without the many clear and express warnings, these plaintiffs had to know that this was a speculative investment with only a contingent tax deduction.

As to the grave warnings in the various documents issued by the tax shelters, Isidore Shochat testified that he does not read the memoranda: "I glance at them" he says, but he paid no attention to the grim warnings in the documents. However, he conceded that he was aware he could suffer losses in the market. The Court credits the testimony of Isidore Shochat at his deposition when he testified that he relied on his own common sense and did not ask for advice.

PHILIP HOWARD LEVINE is a certified public accountant and a tax partner in the firm of Lazar, Levine & Co., which has served as the accounting firm for the plaintiffs and their businesses since 1981 or 1982. Levine is an expert in tax shelters, although he conceded that he is not qualified to "handle" a tax fraud case. Levine was involved in twenty tax shelter offer-

ings between the late 1970s and 1988. He reviewed the offering memoranda for the tax shelters at issue and offered the following opinions:

As to *Sharon Biomedical,* the IRS disallowance was based on a determination that the offering was made, not for the purpose of generating a profit but rather was a "sham transaction" without substance, undertaken to obtain tax benefit. The penalty imposed by the IRS as to the Sharon investment was a 30% understatement penalty in addition to 120% penalty in interest being charged on the underpayment of taxes. Levine did not know if this penalty was paid by the plaintiffs.

As to *Darby Coal,* the IRS determined that the primary purpose of this shelter was "tax avoidance" and the transaction was voided for tax purposes, also based on lack of a bona fide business or profit motive. Among other things, the IRS was particularly concerned about the nonrecourse notes that the plaintiffs signed representing the balance of their investments. According to Levine, the IRS determined that these notes had no validity and it disregarded them as a tax basis for the investors. The IRS further found that there was no active mining activity except a clean-up at the site involved. The deductions as to Darby Coal were totally disallowed and a 120% interest penalty was assessed. (The 120% was explained by Levine as follows: if regular interest rate is 10%, then 120% would be 12%.)

With regard to *Wind Energy,* the IRS determined that this shelter was devoid of profitable objectives and disallowed it in its entirety with a penalty of 120% interest on the deficiencies.

Further, in relation to *MF Computer,* for which plaintiff Samuel Shochat took a deduction of $42,714 in 1978, the IRS also disallowed the deductions in their entirety, stating that the "transactions were not ... true leases" (Plaintiffs' Exh. 22).

Notwithstanding these determinations, according to Levine, the IRS offered to settle on terms advantageous to the plaintiffs since the IRS "couldn't clearly tell what the motivation of the investors was."

From 1981 to 1986, Levine's associate, James Grimaldi, handled the plaintiffs' tax problems. In August 1986, Levine personally assumed the responsibility for the plaintiffs' tax situations and the settlement negotiations with the IRS. These negotiations resulted in a settlement by and between the plaintiffs and the IRS as to three of the tax shelters, Lithographs, Wind Energy and Sharon Biomedical. By the terms of this settlement, the plaintiffs agreed to accept the disallowance of the tax deductions on condition that they were allowed to retain deductions for the amount of money actually invested. The parties stipulated that all the plaintiffs accepted this settlement and they all received deductions for the out-of-pocket money invested in the three said tax shelters.

On cross-examination, Levine testified that his firm prepared tax returns for the plaintiffs which included deductions for some of the tax shelters at issue. Levine further testified that his firm filed a power of attorney on behalf of the plaintiffs as early as October, 1983. Subsequent powers of attorney were filed by Lazar, Levine in 1984, 1985 and August 4, 1987. Each of the powers of attorney revoked prior powers of attorney. The Court finds that since 1982 the plaintiffs were represented in the IRS negotiations by the Lazar, Levine firm and not the defendant.

As stated previously, Levine was able to negotiate a settlement involving three of the tax shelters, namely, Lithographs, Wind Energy and Sharon Biomedical. However, the evidence shows that there was an offer by the IRS to settle with MF Computer and Darby Coal as well. The IRS offer to settle, dated July 12, 1986 (Defendant's Exh. V), for years 1979 and 1980, is a significant document. Addressed to James R. Grimaldi of Lazar, Levine & Co. from the IRS District Director, the settlement offer provides, in part, as follows:

"a) In an effort to administratively dispose of certain tax shelter cases, we are offering to dispose of your return(s) for the above year(s) by allowing out-of-pocket expenses (cash investment) as a

deduction in the initial year of your investment.

If you decide to accept our cash offer, we will issue a revised report allowing you a deduction for out-of-pocket expenses (cash investment) upon receipt of verification of your cash investment.

\* \* \* \* \* \*

If we do not hear from you within 30 days, we will process your case on the basis of the adjustments shown in the enclosed examination report."

Apparently, neither the plaintiffs nor Lazar, Levine accepted the IRS settlement offer within the stipulated time. Since they ultimately accepted a similar offer with regard to Lithographs, Sharon Biomedical and Wind Energy in August or September 1986, the failure to accept a similar offer with regard to MF Computer and Darby Coal could be considered by the Court with regard to mitigation of damages, if the Court reaches the issue of damages. The IRS gave the plaintiffs thirty days from July 12, 1986 to settle, and they either failed or declined to do so. By taking no action, the plaintiffs failed to mitigate their own damages, should the issue of damages become relevant to this determination.

## THE DEFENDANT'S CASE

The defendant STANLEY WEISZ is a certified public accountant practicing public accounting in his own firm. He met the plaintiffs in 1975 and was retained by them personally and in their businesses. He himself purchased tax shelters in the years 1974 through 1980 and again in 1982.

Weisz had discussions with the plaintiffs Samuel and Isidore Shochat in 1977 regarding tax shelters. According to Weisz, the plaintiffs had heard of tax shelters—they were the "rage" at the time—and asked Weisz about them. He explained the possibility of a write-off and deferral of taxes to a later date, coupled with the possibility that the tax shelter could make money.

The defendant invested in Noble Coal in 1977. The promoters were Bentley Blum and Myron Friedman, the same promoters who were connected with Darby Coal. According to the defendant, both Noble Coal and Darby Coal were in an overall program called Somerset Coal. Weisz informed the plaintiffs that he was buying a shelter called Noble Coal. They indicated they were interested in acquiring a shelter and he showed them certain documents. Although the defendant testified that he did not urge the plaintiffs to make the investments, the Court does not credit this testimony. It would be highly unlikely for the plaintiffs to initiate these transactions, especially in view of the fact that the defendant was more than a mere "stranger" to the tax shelters. In fact, he was the auditor for some of the shelters and was in a real estate partnership with some of the promoters.

Weisz testified that he was not an employee, agent or officer of Darby Coal and that he received no consideration as a result of the plaintiffs' purchases of that shelter. Also, he was not the auditor for Darby Coal. He further stated that he never told the plaintiffs that the clear warnings were merely "boilerplate" and should be ignored. In fact, according to Weisz, he advised the plaintiffs that the risks referred to in the memoranda "are very real" and that he never "guaranteed a profit but merely stated that it was a 'possibility'." The Court credits this testimony.

As to Wind Energy, the defendant himself invested heavily, in the substantial sum of $303,000, in a sister company, called Solar Devices. The promoters of both companies were Jack Isaacson, Myron Friedman and Leo Chizner. He was in a real estate partnership with Chizner and Friedman called MF Properties. The check paid to Ladimir in the sum of $2,000 for acting as President of Wind Energy was an MF Properties check. According to the defendant, such payment was not a bonus but rather was in partial payment for the services of Ladimir to act as President of Wind Energy.

In addition, in 1980 and 1981 Weisz invested in a sister company of Sharon Biomedical, called Joseph Biomedical in the total sum of $91,000. The promoters for

these companies were Friedman, Chizner and Walter Bernstein. Weisz told the plaintiffs that he was going to invest in Joseph Biomedical in order to shelter his income. They were interested in doing the same thing. His accounting firm was the auditor for Sharon Biomedical and Joseph Biomedical, a fact clearly set forth in the prospectus.

However, Weisz testified that he had never heard of the Lithographs tax shelter and had no involvement with that entity. He stated that Samuel Shochat created Lithographs with a relative.

Weisz also testified that he had nothing to do with the tax shelter known as MF Computer. In fact, he stated that the plaintiffs themselves initiated this investment when they were inquiring about a computer system for their business. Weisz testified that he did not buy or sell MF Computer, never saw its prospectus, and did not receive any compensation as a result of the plaintiffs' involvement in MF Computer. The Court credits the defendant's testimony with regard to his lack of involvement in the Lithographs and MF Computer tax shelters. The Court finds that the defendant had no involvement in the investments by the plaintiffs in Lithographs and MF Computer.

The defendant apparently had similar trouble with the IRS in relation to his tax shelters. In November, 1987, in closing agreements with the IRS (*see* Defendant's Exhs. T and U), Weisz was given credit for his out-of-pocket investments in two Solar Device tax shelters in the total sum of $241,000, out of his total investment of $303,000.

With regard to IRS treatment of tax shelters, Weisz testified that in 1978 Congress passed a law aimed at restricting deductions in tax shelters financed by non-recourse notes. Weisz testified that Sharon Biomedical did not involve non-recourse notes and was a permissible deductible investment under the Code in 1979 and 1980.

In February 1982, Weisz ceased being the accountant for the Shochats when they retained the firm of Lazar, Levine & Co. The plaintiffs asked him to cooperate with

their new accountants and he did so. He stated he also cooperated in the settlement of the plaintiffs' tax shelter cases.

In 1985, both Sharon Biomedical and Joseph Biomedical were disallowed by the IRS. Contrary to the plaintiffs' contentions, Weisz testified that he was not retained by the plaintiffs to settle their tax problems nor was he even asked by them to assist in this endeavor. Earlier, he had represented the plaintiffs at IRS under a power of attorney. After discharging Weisz as their accountant, the plaintiffs gave powers of attorney to Lazar, Levine & Co. which expressly revoked Weisz's power of attorney.

Under the terms of the July 12, 1986 offer of settlement (Defendant's Exh. V), if accepted by the plaintiffs, they would have had to pay the taxes payable if no tax shelter was being proposed, less their out-of-pocket expenses and interest. No fraud penalties were assessed. Weisz himself accepted a similar settlement with regard to his own tax shelters.

On cross-examination, the defendant's business relations with Chizner and Friedman were revealed in greater detail. The defendant purchased real property with Chizner and Friedman. From 1975, the three were equal partners in MF Properties in which the plaintiff invested approximately $50,000, until the firm was discontinued in 1981.

As to the tax shelters at issue, the defendant testified that he discussed the subject of shelters with the plaintiffs in 1977 and told them that he himself had invested in shelters and that eight or nine of his clients had also done so. In fact, six or seven of his clients had invested in Wind Energy. Weisz denied that he had advised the plaintiffs that they *should* invest; he merely gave them information regarding the shelters. The plaintiffs asked him what shelters he had invested in and he gave them his prospectus. Weisz stated that he did not "persuade" the plaintiffs to invest in the shelters.

As to Ladimir's role in the Wind Energy shelter, the defendant's testimony that La-

dimir *asked* to be President of Wind Energy and that he was qualified to be the President and Chief Operating Officer of the new firm, even though he was only a "functionary" in the Weisz accounting firm, is beyond belief.

As to the defendant's role as the auditor of Sharon Biomedical, Weisz stated that this information appeared in the offering memo but that he did not specifically advise the plaintiffs about it. Weisz also conceded that he did not advise the plaintiffs that he received accounting fees from Myron Friedman or that he was a partner with Chizner and Friedman in MF Properties. The Court finds, under the particular circumstances of this case involving the investment in patently risky tax shelters whose main purpose was to afford the plaintiffs immediate and substantial tax benefits, the defendant had no obligation to advise the plaintiffs about his dealings with Chizner and Friedman. Further, the fact that the defendant did not advise the plaintiffs that he was the auditor of Sharon Biomedical would not have dissuaded the plaintiffs from investing in that shelter. Stated simply, if the plaintiffs were looking to shelter their income, which they concededly were, and they were told their own accountant was the auditor for a tax shelter, reason and logic compels the belief that they would have been even more anxious to invest in that shelter.

Weisz testified, without contradiction, that he had no part in the drafting, publishing or distributing of any of the memoranda relating to any of the tax shelters in evidence. He further stated, also without dispute, that he had no part in promoting the tax shelters at issue. The Court finds that the defendant was not a promoter of the tax shelters at issue. In addition, the plaintiffs failed to prove that the defendant received any compensation from the shelters as a result of the investments made by the plaintiffs.

## THE APPLICABLE LAW

This case involves an accountant, investors and tax shelters. A review of the cases involving such persons and entities is instructive.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) the liability of an accounting firm in a securities fraud case was reviewed. The Supreme Court held that the words "manipulative" and "deceptive" as used in Section 10b were "intended to proscribe knowing and intentional misconduct" rather than negligence. In order to be actionable, the accountant's conduct must be "intentional or willful conduct designed to deceive or defraud investors."

### The Element of "Reliance"

■ The element of "reliance" is a necessary component of a securities fraud action. An investor must prove that he relied upon the representations of the accountant in order to succeed in this kind of fraud claim. When a prospectus clearly indicates that the projected tax benefits are of a speculative or risky nature or that no assurance concerning the realization of the projected tax benefits can be given, an investor is not entitled to recover, on a fraud claim, against an accountant as a result of the failure of the tax shelter to fulfill the stated projections. In *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986), the rule was clearly set forth, as follows:

"However, the Offering Memorandum made it quite clear that its projections of potential cash and tax benefits were 'necessarily speculative in nature' and that '[n]o assurance [could] be given that these projections [would] be realized.' Indeed, the Offering Memorandum warned prospective investors that '[a]ctual results may vary from the predictions and these variations may be material.' We are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.' *Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977) (quoted approvingly in *Goldman v. Belden*, 754 F.2d 1059, 1068 (2d Cir.1985))."

■ In such a case, where an investor is put on notice of the speculative nature of

the shelter, the investor must exercise reasonable diligence and obtain sufficient information on which to reach an informed investment decision (see Topalian v. Ehrman, 954 F.2d 1125, 1134 [5th Cir.1992]; Hayden v. Feldman, 753 F.Supp. 116, 120 [S.D.N.Y.1990]).

Several recent cases illustrate the weakness of a securities fraud claim in the face of such express warnings. In Harner v. Prudential–Bache Securities, Inc., 785 F.Supp. 626 (E.D.Mich.1992), Judge Rosen found that the risk factors in a prospectus constituted "storm warnings" and that the investors' failure to investigate was fatal to a RICO claim. The Court held that these storm warnings were "so specific and comprehensive" as to forewarn a reasonable investor that additional inquiry would be necessary. The plaintiff had to exercise "reasonable reliance" since the prospectus contained many cautionary notices. These warnings would alert any reasonable investor to the possibility of loss in the investment. The law "assume a certain level of comprehension and judgment among investors." The prospectus made clear that the investment was risky and "nothing more was required."

In Adler v. Berg Harmon Assoc., 790 F.Supp. 1235 (S.D.N.Y.1992), Judge Conner stated that:

"The securities laws were not enacted to protect sophisticated investors from their own errors of judgment, . . . ."

In Adler, the private placement memorandum was "replete with warnings" of the speculative nature of the investments and the risks attached. The Court concluded that sophisticated investors could not have reasonably relied on statements in the offering forecast about future performance of their investments. The Court stated the following meaningful language as to the element of "reasonable reliance":

"[I]t is well established in this Circuit that, with respect to future projections and other expectations which were expressed in the offering memorandum or in the attachments thereto, there is no liability under s 10(b) for statements in an offering memorandum that 'bespeaks

caution.' Luce v. Edelstein, 802 F.2d at 56; Haggerty v. Comstock Gold Co., 765 F.Supp. 111, 115 (S.D.N.Y.1991) (no reasonable reliance where offering memorandum bristled with warnings as to the extremely risky nature of the investment described therein, as well as the highly speculative nature of the memoranda's projections as to future results); Antonoff v. Bushell, 1991 WL 95433, at *4 (S.D.N.Y.1991) (numerous cautionary statements in the offering memorandum precluded s 10(b) liability based on allegedly misleading financial projections); Friedman v. Arizona World Nurseries Ltd. Partnership, 730 F.Supp. 521, 541 (S.D.N.Y.1990), aff'd, 927 F.2d 594 (2d Cir.1991) (warnings and disclaimers limit degree to which an investor may reasonably rely on offering memoranda as forecast of future).

The PPMs in the instant action are replete with warnings of the speculative nature of the investments and the risk that any investment may result in a loss. For example, the PPM for Tree Lake Apartments Associates, Ltd. informs the prospective investor as follows:

"7. THE INVESTMENT DESCRIBED IN THIS MEMORANDUM INVOLVES A HIGH DEGREE OF RISK. SEE RISK FACTORS. PURCHASE OF UNITS SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE POSSIBILITY OF A TOTAL LOSS OF THEIR INVESTMENT AND WHO ARE NOT SEEKING A CURRENT CASH RETURN ON INVESTED CAPITAL.' "

The Adler decision contains even more relevant language regarding the speculative nature of tax shelters, as follows:

"In view of all of the foregoing warnings and other cautionary language contained in the PPMs, the Court concludes that sophisticated investors such as plaintiffs cannot have reasonably relied on statements in the offering materials as an accurate forecast of the future performance of their investments. Although plaintiffs now argue that they were misled into believing that the respective

projects could operate profitably, such an argument is untenable. *One glance at the financial projections in the offering memoranda before the Court indicates that tax deductions, rather than profits, were the immediate benefit to be expected by an investor*—the immediate prospects for the partnerships were for substantial losses. Although investors may have hoped for additional benefits from the ultimate sale or refinancing of the property, none was promised in the PPMs, which virtually abound with warnings of the risks and imponderables. Accordingly, the allegations in the Compliant suggesting that defendants misrepresented the extent of the economic benefits that would flow to the limited partners from an investment in the partnership and the allegations respecting the misleading nature of the financial projections and risk estimates must fail" (emphasis supplied).

### The Element of "Scienter"

As stated above, to establish a claim under Section 10(b) or Rule 10b–5, the plaintiffs must prove their reliance upon misrepresentations or omissions of material facts made with scienter, namely an intent to deceive or defraud by the defendant, which caused them damage. Scienter is a significant element in a fraud action.

Notwithstanding all the warnings as to the grave risks of these investments, both as to a tax shelter and as to profitability, there could be liability imposed against the defendant Weisz in this case if the plaintiffs proved that Weisz *knew,* at the time he recommended the shelters, that there was no reasonable chance that the entities would be approved by the IRS. In this regard, the element of "scienter" or fraudulent intent is the key element to be proved in this fraud cause of action.

The United States Supreme Court defined the term scienter as used in a securities fraud case, as follows:

"The term 'scienter,' as applied to conduct necessary to give rise to an action for civil damages under Securities Exchange Act of 1934 and rule 10b–5 refers to a mental state embracing *intent to deceive, manipulate* or *defraud*" (emphasis supplied). (*Ernst and Ernst v. Hochfelder, Ill.,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668).

For liability to attach under Section 10(b), the plaintiffs must prove "scienter" on the part of this defendant. In *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990), Judge Altimari warned that *Luce* and *DiVittorio* (*DiVittorio v. Equidyne,* 822 F.2d 1242 [2d Cir.1987]) "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." For Rule 10b–5 purposes, scienter includes recklessness (*see Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142 [2d Cir.1991]; *IIT v. Cornfeld,* 619 F.2d 909, 923 [2d Cir.1980]).

Thus, an investor must show intent and knowledge of the fraud or recklessness on the part of the accountant in order to recover on a fraud claim. Without such a showing, an investor at best proves a claim of breach of contract and not securities fraud (*Hayden, supra,* 753 F.Supp. at p. 199). Moreover, in order for an investor to recover based upon an accountant's alleged material omission, the information omitted must be of the type that would have been significant to a reasonable investor's decision had it been disclosed. (*Gould v. Berk & Michaels, P.C.,* Fed.Sec. L.Rep. [CCH] ¶ 96, 150 [S.D.N.Y. July 29, 1991] [citing *TSC Industries v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)]). If the information which the accountant failed to disclose to the investor would not have been significant to the investor's assessment of the quality of the shelter, there can be no fraud cause of action based on this omission (*Gould, supra*).

Now, what about the specific situation concerning an accountant, his clients and tax shelters? In order to succeed on a fraud claim against an accountant for liability for a failed tax shelter, an investor must prove an intentional and purposeful fraudulent scheme involving the accountant (*see Gould, supra*). In *Gould,* the plaintiffs sued their accountant based on

securities fraud and pendent state claims with regard to the plaintiffs' investment in a tax shelter recommended by the accountant-defendants. The plaintiffs proceeded on three grounds: (1) the failure of the tax shelter to provide a four-to-one tax write-off, as stated by the accountant-defendants; (2) the failure of the tax shelter to be "an appropriate tax shelter for [the plaintiffs'] money"; and (3) the accountant-defendants' alleged failure to disclose a commission they received from selling interests in the tax shelter.

In discussing the claims against the accountant-defendants, Judge Kram stated that a plaintiff must "specifically show how or why the expert should have believed the projections to be inaccurate." Moreover, the Court noted that "[t]he mere allegations that the tax benefits of [the shelter] were later disallowed by the IRS does not, in itself, raise a claim of fraudulent misstatement." (*Id.* [citing *Kaufman v. Amtax Planning Corp.*, 669 F.Supp. 573, 576 (S.D.N.Y.1986)]). A plaintiff must show that, for example, "defendants never intended the investments to yield a tax advantage at all," or that the accountant-defendant knew in advance or had a basis for knowing that the shelter would not materialize.

Furthermore, Judge Kram found that the plaintiffs did not show that the accountant-defendants failed to investigate the shelter. The plaintiffs' simple showing that the accountant-defendants should have made further inquiries into the viability of the investment as a tax shelter but failed to do so did not rise above the level of mere negligence.

## AS TO THE CLAIMED MISREPRESENTATIONS AND OMISSIONS

The crucial misrepresentations and omissions which the plaintiffs pleaded and attempted to prove are as follows:

### As to Wind Energy

1. That the defendant falsely stated that Louis Ladimir was the Chairman and Chief Executive Officer or Chief Operating Officer of Wind Energy;

2. That the defendant failed to disclose that Ladimir's signature on a contract to perform research and development was a forgery;

3. That Wind Energy lacked the criteria necessary to qualify as a legitimate tax shelter and the deductions taken had no reasonable chance of being allowed by the IRS.

### As to Darby Coal

1. That Darby Coal lacked the criteria necessary to qualify as a legitimate tax shelter and the deductions taken had no reasonable chance of being allowed by the IRS.

### As to Sharon Biomedical

1. That Sharon Biomedical lacked the criteria necessary to qualify as a legitimate tax shelter and the deductions taken had no reasonable chance of being allowed by the IRS.

## THE COURT MAKES THE FOLLOWING ADDITIONAL FINDINGS OF FACT

1. The plaintiffs failed to establish that the defendant Weisz initiated their investment in MF Computers.

2. The plaintiffs failed to establish that the defendant made any representations or omissions concerning MF Computers.

3. The plaintiffs failed to establish that the defendant recommended the tax shelter known as Lithographs; made any representations or omissions with regard to Lithographs; or had anything to do with that tax shelter.

4. As to Wind Energy, the plaintiffs failed to establish that they relied upon any misrepresentations concerning Louis Ladimir as Chairman or officer.

5. As to Wind Energy, the plaintiffs failed to establish that the listing of Ladimir's name in the papers as an officer had any effect whatsoever on their decision to invest in that shelter.

6. As to Wind Energy, the plaintiffs failed to prove that they *relied* upon any representations by the defendant that Wind

Energy was a legitimate tax shelter and that the deduction had a reasonable chance of being allowed by IRS.

7. On the contrary, the Court finds that the plaintiffs had clear and unequivocal warnings that Wind Energy was a risky investment, with no assurances that it would be allowed by the IRS, and with only a "possibility" of making any profit.

8. The plaintiffs failed to establish that, at the time of their investment, the defendant knew that Wind Energy lacked the criteria necessary to qualify as a legitimate tax shelter.

9. The plaintiffs failed to establish that, at the time of their investment in Wind Energy, the defendant knew that the deduction had no reasonable chance of being allowed by IRS.

10. The plaintiffs failed to establish that the defendant acted in a "reckless" manner with regard to items 8 and 9 above.

11. The plaintiffs failed to establish that, at the time of their investment, the defendant knew that Darby Coal lacked the criteria necessary to qualify as a legitimate tax shelter.

12. The plaintiffs failed to establish that, at the time of their investment in Darby Coal, the defendant knew that the deduction had no reasonable chance of being allowed by IRS.

13. The plaintiffs failed to establish that the defendant acted in a "reckless" manner with regard to items 11 and 12 above.

14. The plaintiffs failed to establish that, at the time of their investment, the defendant knew that Sharon Biomedical lacked the criteria necessary to qualify as a legitimate tax shelter.

15. The plaintiffs failed to establish that, at the time of their investment in Sharon Biomedical, the defendant knew that the deduction had no reasonable chance of being allowed by IRS.

16. The plaintiff failed to establish that the defendant acted in a "reckless" manner with regard to items 14 and 15 above.

17. The plaintiff failed to establish, by a preponderance of the credible evident, any *scienter* or recklessness on the part of the defendant with regard to the viability of the tax shelters as allowable deductions.

18. The plaintiffs failed to establish, by a preponderance of the credible evidence, *reliance* by the plaintiffs on any representations or omissions made by the defendant as to the Wind Energy and Sharon Biomedical tax shelters.

19. The Court finds that the failure to advise the plaintiffs that the defendant was the auditor for Sharon Biomedical was not a material omission; namely, that even if the defendant had disclosed this fact, it would not have deterred the plaintiffs from making their investments in that tax shelter.

20. The plaintiffs failed to establish that the defendant agreed to negotiate with the IRS regarding the disallowance on their behalf.

21. The Court finds that Lazar, Levine & Co., and not the defendant, were authorized by the plaintiffs to negotiate with the IRS.

22. The plaintiffs failed to establish that the defendant had any part or involvement in preparing, drafting or publishing any memoranda or documents regarding any of the tax shelters at issue.

23. The plaintiffs failed to establish that the defendant played any part in promoting the tax shelters at issue.

## AS TO THE PENDENT STATE COMMON LAW FRAUD CAUSE OF ACTION

In order to recover damages in a New York State common law fraud cause of action,

" 'the plaintiff must prove: (1) a misrepresentation of fact, (2) which was false and known to be false by the defendant, (3) that the representation was made for the purpose of inducing the other party to rely upon it, (4) the other party justifiably did so rely, (5) causing inquiry' (*Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461,

467, 453 N.Y.S.2d 750 [2d Dep't 1982]; *see also, Channel Master Corp. v. Aluminum Ltd. Sales,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833; *Roney v. Janis,* 77 A.D.2d 555, 430 N.Y.S.2d 333 *aff'd* 53 N.Y.2d 1025, 442 N.Y.S.2d 484, 425 N.E.2d 872; *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186; Restatement [Second] of Torts § 525; 60 N.Y. Jur.2d, Fraud and Deceit, § 11)." (*Ruse v. Inta–Boro Two–Way Radio,* 166 A.D.2d 641, 561 N.Y.S.2d 70 [2d Dep't 1990]) (*see also, Backer v. Lewit,* 180 A.D.2d 134, 584 N.Y.S.2d 480 [1st Dep't 1992]).

■ As is required in the securities fraud cause of action, the plaintiff in a state common law fraud cause of action must prove the elements of "reliance" and "scienter" (*see Curran, Cooney, Penney, Inc. v. Young, Koomans, Inc.,* —— A.D.2d ——, 583 N.Y.S.2d 478 [2d Dep't 1992]; *Marine Midland Bank v. Simpson Edson Inc.,* 120 A.D.2d 709, 502 N.Y.S.2d 774 [2d Dep't 1986]).

The Court finds that the plaintiffs failed to establish, by a preponderance of the credible evidence, in the common law fraud cause of action that they relied upon any material misrepresentations or material omissions. The Court further finds that the plaintiffs failed to establish, by a preponderance of the credible evidence, that any representations made by the defendant with respect to the viability of the tax shelter or the criteria for which a tax shelter would be evaluated and with respect to the potential deductibility of the investments, were known to be false by the defendant when made.

## CONCLUSIONS OF LAW

■ 1. The plaintiffs failed to establish, by a preponderance of the credible evidence, that the defendant Stanley Weisz made any material representations or omissions with regard to the plaintiffs' investments in the Lithographs and MF Computer tax shelters.

2. The plaintiffs failed to establish, by a preponderance of the credible evidence, that they "relied" on any material affirma-

tive misrepresentation or omission made by the defendant Stanley Weisz with regard to any of the five (5) tax shelters at issue in this case.

3. The plaintiffs failed to establish, by a preponderance of the credible evidence, that the defendant Stanley Weisz knew or was reckless in failing to know that, at the time of the plaintiffs' investments, the shelters at issue lacked the criteria necessary to qualify as legitimate tax shelters and/or that the deductions taken by the investors in said tax shelters had no reasonable chance of being allowed by the IRS.

In view of these conclusions, the Court need not address the question of damages, which is a complex issue in this case. However, the Court notes in regard to damages that the proof offered by the plaintiffs was confusing, convoluted, unclear and not susceptible of clear ascertainment by the Court.

## FINAL CONCLUSION

For the reasons stated, the Court directs the entry of a judgment in favor of the defendant Stanley Weisz dismissing both causes of actions in the amended complaint and the Clerk is directed to enter a judgment in accordance with this decision.

SO ORDERED.