Robert N. STANTON, Plaintiff,

v.

RICH BAKER BERMAN & CO., P.A., Rosenberg Druker & Company, P.A., RD/RBB Certified Public Accountants, P.A., Alvin P. Levine, Barry D. Kopp, Nicholas Truglio, Frank S. LaForgia, Kalman A. Barson, Aaron A. Rich, Howard Baker and Kenneth A. Berman, Defendants.

Civ. A. No. 94–2619 (AJL).

United States District Court, D. New Jersey.

Jan. 30, 1995.

---

30. The potential back pay remedy is to be obtained from the Board's final decision.

Robert N. Stanton, pro se plaintiff.

Richard J. Schachter, Schachter, Trombadore, Offen, Stanton & Pavics, P.A., Somerville, NJ, for defendants.

## OPINION

LECHNER, District Judge.

This is an action by *pro se* plaintiff Robert N. Stanton ("Stanton") against defendants Rich Baker Berman & Co., P.A. ("RBB"), Rosenberg Druker & Company, P.A. ("RD"), RD/RBB Certified Public Accountants, P.A. ("RD/RBB"), Alvin P. Levine ("Levine"), Barry D. Kopp ("Kopp"), Nicholas Truglio ("Truglio"), Frank S. LaForgia ("LaForgia"), Kalman A. Barson ("Barson"), Aaron A. Rich

("Rich"), Howard Baker ("Baker") and Kenneth A. Berman ("Berman") (collectively, the "Defendants") for recovery of fees under two finder's agreements. The legal theories pursuant to which recovery is sought include breach of contract, third party beneficiary, Section 14A:10–6(e) of the New Jersey Business Corporation Act,[1] quantum meruit, unjust enrichment, tortious interference and fraud. *See* Complaint, filed 2 June 1994 (the "Complaint"). Jurisdiction is alleged pursuant to 28 U.S.C. § 1332. *Id.*, ¶ 7.

Currently before the court is the motion for partial summary judgment by Stanton on Claims One through Four in the Complaint and the cross-motion by Defendants for partial judgment contending the two finder's agreements they signed are void as against public policy.[2] For the reasons set forth below, the motion by Stanton for partial summary judgment is granted; the cross-motion by Defendants for partial summary judgment is denied.

*Facts*

A. *The Parties*

Stanton is a citizen of the state of New York. Complaint, ¶ 1; Defendants' 12(G) Statement, ¶ 1. RBB and RD were professional corporations organized under the laws of the state of New Jersey with their principal places of business in New Jersey. Complaint, ¶¶ 2–3; Defendants' 12(G) Statement, ¶ 5. RD/RBB is a professional corporation organized under the laws of the state of New

---

1. Section 14A:10–6(e) of the New Jersey Business Corporation Act provides: " 'The surviving or new corporation shall be liable for all obligations and liabilities of each of the corporations so merged or consolidated....' " N.J.S.A. § 14A:10–6(e).

2. In support of his motion and in opposition to the Defendants' cross-motion, Stanton submitted: Plaintiff's Brief in Support of Motion for Partial Summary Judgment; Plaintiff's Reply Brief in Support of Motion for Partial Summary Judgment and in Opposition to Defendants' Cross-Motion (the "Stanton Reply Brief"); Plaintiff's Statement Pursuant to Rule 12(G); Affidavit of Stanton in Support of Motion for Partial Summary Judgment, dated 29 August 1994 (the "Stanton Aff."), attaching Exhibits 1 through 12.

 In opposition to Stanton's motion, and in support of their cross-motion for partial summary judgment, the Defendants submitted: Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Defendants' Cross–Motion for Partial Summary Judgment (the "Opp. Brief"); Brief in Further Opposition to Plaintiff's Motion and in Further Support of Defendants' Cross–Motion (the "Defendants' Reply Brief"); Defendants' Statement Pursuant to Rule 12(G) (the "Defendants' 12(G) Statement"); Affidavit of Rich in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated 5 October 1994 (the "Rich Aff."); Affidavit of LaForgia in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated 4 October 1994 (the "LaForgia Aff."); Affidavit of Barson in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated 4 October 1994.

Jersey. Complaint, ¶ 4; Defendants' 12(G) Statement, ¶ 5.

Rich, Baker and Berman are citizens of the state of New Jersey and were stockholders in RBB. Complaint, ¶ 5; Defendants' 12(G) Statement, ¶¶ 2, 5. Levine, Kopp, Truglio, LaForgia and Barson are citizens of the state of New Jersey and were stockholders in RD. Complaint, ¶ 6; Defendants' 12(G) Statement, ¶¶ 5, 8.

### B. *Background*

#### 1. *The Finder's Agreements*

In or about January 1991, RBB and its stockholders Rich, Baker and Berman entered into a written finder's agreement (the "RBB Finder's Agreement"), *see* Exhibit A to the Complaint, under which Stanton was entitled to a finder's fee in the event RBB entered into a transaction with another firm introduced by Stanton. Stanton Aff., ¶ 11; Defendants' 12(G) Statement, ¶ 6. A transaction is defined in the RBB Finder's Agreement as a purchase, sale, merger or employment. RBB Finder's Agreement, ¶ 10.

In or about July or August of 1992, Stanton entered into an identical finder's agreement with RD (the "RD Finder's Agreement"), *see* Exhibit B to the Complaint (the RBB Finder's Agreement and the RD Finder's Agreement, collectively are referred to as the "Agreements"). Stanton Aff., ¶ 12; Defendants' 12(G) Statement, ¶ 8.

The Agreements provide:

8. *Finder's Fee from Other Party.* [RBB or RD] understand that [Stanton] may, in addition, receive compensation from the other party to the [t]ransaction. [RBB or RD] ha[s] no objection. [RBB or RD] agree not to assist any [p]erson [defined in paragraph ten as any person, firm, partnership, corporation or other entity] to avoid the payment to [Stanton] of any finder's fee.

RBB Finder's Agreement, ¶ 8; RD Finder's Agreement, ¶ 8. The RBB Finder's Agreement was modified by a contemporaneous letter, dated 21 January 1994 (the "21 Janu-

ary Letter"), *see* Exhibit A to the Complaint,[3] which provides: "[Stanton] will not receive a finder's fee from the other party that is different from the finder's fee [RBB is] paying [Stanton]."

The Agreements are non-exclusive: "[RBB and RD] shall be free to solicit transactions on [their] own without liability or obligation to [Stanton]." RBB Finder's Agreement, ¶ 7; RD Finder's Agreement, ¶ 7. Finally, according to the Agreements they are to be "enforced in accordance with the laws of New York State." RBB Finder's Agreement, ¶ 14; RD Finder's Agreement, ¶ 14.

#### 2. *The Introduction of RBB and RD*

On or about 18 August 1992, Stanton advised RD and RBB that they were potential candidates for a transaction. Stanton Aff., ¶ 16; Defendants' 12(G) statement, ¶ 14. The Defendants contend RD, already knew that RBB was seeking to be acquired. Defendants' 12(G) Statement, ¶ 14. Stanton arranged an introductory meeting of RD and RBB on or about 21 August 1992. Stanton Aff., ¶ 16.

#### 3. *The Merger Agreement*

Prior to 5 March 1994, RD reincorporated itself as RD/RBB. Defendants' 12(G) Statement, ¶ 15. On or about 5 March 1994, RBB and RD/RBB entered into a transaction (the "Transaction") evidenced by a document entitled "Plan and Agreement of Merger" (the "Merger Agreement"), *see* Exhibit 7 to the Stanton Aff., providing for the merger of 100% of RBB into RD/RBB. *Id.* at 4; Defendants' 12(G) Statement, ¶ 16.

The Merger Agreement provides:

#### 1. *THE MERGER*

A. *Delivery and Filing of Certificate of Merger* .... RD/RBB and RBB will cause a [c]ertificate of [m]erger ... to be signed, verified and delivered to the Secretary of the State of New Jersey as provid-

---

**3.** Both the RBB Finder's Agreement and the 21 January Letter are included in Exhibit A to the Complaint.

ed in Section 14A:10–4 [4] of the New Jersey Business Corporation Act.

B. *Effective Date of Merger.* The [e]ffective [d]ate of the merger shall be the later of January 4, 1994 or the close of business on the day the [c]ertificate of [m]erger shall have been filed with the Secretary of the State of New Jersey. As of the [e]ffective [d]ate of the merger, the separate existence of RBB shall cease and it shall be *merged with and into RD/RBB* which shall be the [s]urviving [c]orporation.

. . . . .

F. *Conversion and Exchange of Stock.* The manner of converting the shares of RBB's stock issued and outstanding immediately prior to the [e]ffective [d]ate of the merger into RD/RBB [s]tock shall be as follows:

(1) *RBB Stock.* Each share of RBB [s]tock issued and outstanding immediately prior to the [e]ffective [d]ate of the merger shall be cancelled and four hundred forty-two (442) shares of fully paid and nonassessable shares of RD/RBB stock shall be issued in full replacement and substitution thereof. . . .

(2) *RD/RBB Stock.* Each share of RD/RBB [s]tock issued and outstanding immediately prior to the [e]ffective [d]ate of the merger shall be cancelled and in full substitution and replacement thereof, five hundred twenty (520) shares of fully paid and nonassessable shares of RD/RBB stock shall be issued to the holders of the [cancelled] RD/RBB stock immediately prior to the merger. . . .

. . .

Merger Agreement at 4–6 (emphasis in original).

On or about 28 March 1994, pursuant to the terms of the Merger Agreement, the Defendants filed a Certificate of Merger (the "Certificate of Merger"), *see* Exhibit 11 to the Stanton Aff., with the Department of State of the State of New Jersey. Defendants' 12(G) Statement, ¶ 19. The Certificate of Merger states: "On the effective date of the merger, the separate existence of [RBB] shall cease and RD/RBB ... shall become the owner, without other transfer, of all of the rights and property of RBB and [RD/RBB] ... shall become subject to all the debts and liabilities of ... [RBB] in the same manner as if [RD/RBB] itself had incurred them." Certificate of Merger, ¶ 2.B.i.

"Immediately following the consummation of the merger, the former principals of RBB owned 46 percent of the shares of . . . RD/RBB, and had contributed 46 percent of its capital. The former principals of RD owned 54 percent of the shares of RD/RBB and had contributed 54 percent of its capital." Defendants' 12(G) Statement, ¶ 21.

Additionally, the Merger Agreement provides: "The Board of Directors and stockholders of RD/RBB and RBB, respectively, have approved and adopted th[e] [Merger] Agreement as a Plan of Reorganization within the provisions of Section 368(a)(1)(A) of the Internal Revenue Code of 1986, as amended. . . ." Merger Agreement at 4. Section 368(a)(1)(A) of the Internal Revenue Code defines reorganization as "a statutory merger or consolidation. . . ." 26 U.S.C. § 368(a)(1)(A).

4. *Attempted Collection Under the Agreements*

As the Defendants explain, according to the Agreements, Stanton's "compensation in the event of merger is based upon the [s]maller . [p]ractice['s] [g]ross [f]ees ... [which in this case] are those of RBB and equal to $2,500,000." Defendants' 12(G) Statement, ¶ 25. Under the formula outlined in the Agreements, Stanton's compensation in the event of a merger between RD and RBB would equal $105,000.00. *Id.*, ¶ 26; Stanton Aff., ¶ 30. Of this amount, 20 per-

---

**4.** Section 14A:10–4, has been repealed, redrafted and reenacted as Section 14A:10–4.1. N.J.S.A. § 14A:10–4.1. Both versions, however, provide that "[a]fter approval of the plan of merger ... a certificate of merger shall be executed[;]" both versions also state what the certificate of merger must contain and that a merger becomes effective after the Secretary of State files the certificate of merger. N.J.S.A. § 14A:10–4; N.J.S.A. § 14A:10–4.1.

cent, or $21,000.00, was due at closing and the balance in 48 monthly installments of $1,750.00 beginning 1 April 1994.[5] Defendants' 12(G) Statement, ¶ 26; Stanton Aff., ¶ 30.

On 8 March 1994, Stanton sent both RBB and RD a bill for $21,000.00. Defendants' 12(G) Statement, ¶ 28. LaForgia, by letter dated 11 March 1994 (the "LaForgia Letter"), see Exhibit 5 to the Stanton Aff., explained the Defendants' contention that the Transaction was a merger as to thirteen percent of RBB's practice and a purchase as to the remaining eighty-seven percent.[6] Id.; Defendants' 12(G) Statement, ¶ 29.

According to the Defendants: "Although the form of the [T]ransaction ... was that of a statutory merger, the [T]ransaction in substance was a purchase by RD/RBB of the interest[s] of ... Rich, Baker, and Berman, but was a merger of the interest[s] of [Carl] Schwartz ["Schwartz"] and [Steven] Truppo ["Truppo"], all five of whom were stockholders of RBB." Opp. Brief at 19. Defendants allege that the Transaction is structured so neither Rich, Baker nor Berman receive the benefit of any future financial gains nor incur any risk of future loss and are paid in installments for their stock upon retirement. Rich Aff., ¶ 12.

On or about 23 March 1994, Stanton sent notices of default, pursuant to the Agreements, to the Defendants. Stanton Aff., ¶¶ 32–33; Defendants' 12(G) Statement, ¶ 33. On or about 26 March 1994, LaForgia sent Stanton a check for $3,854.00 purporting to represent the full amount owed under the Agreements by the Defendants based on the Defendants' contention that there was not a complete merger of RBB's practice. Stanton Aff., ¶ 34; Defendants' 12(G) Statement, ¶ 29; LaForgia Letter (explaining Defendants' calculation of amount owed).

Stanton returned the check to the Defendants with an accompanying letter, dated 29 March 1994 (the "29 March 1994 Letter"), see Exhibit 12 to the Stanton Aff. In the 29 March Letter, Stanton explained that under the Agreements, and pursuant to the Stockholder Agreement of RD/RBB (the "Stockholder Agreement"), see Exhibit 8 to the Stanton Aff., and the Merger Agreement, the Transaction was a merger not a purchase—irrespective of any payments to be made to stockholders upon retirement. 29 March 1994 Letter; Stanton Aff., ¶ 35. The 29 March Letter further stated if payments under the Agreements were not made accordingly, the amount owed would be accelerated under paragraph 6 of Agreements.[7] Id.; Stanton Aff., ¶¶ 35–36. On 25 April 1994, Stanton sent notices to the Defendants of the acceleration of the entire amount due under the Agreements. Stanton Aff., ¶ 39; Defendants' 12(G) Statement, ¶ 36.

---

5. The Agreements provide:
 2. *Merger.* [Stanton's] finder's fee shall be based on the [s]maller [p]ractice's [g]ross [f]ees and shall equal five percent (5%) of the first million dollars, four percent (4%) of the second million dollars, three percent (3%) of the third million dollars, two percent (2%) of the fourth million dollars and one percent (1%) of each additional million dollars of the [s]maller [p]ractice's [g]ross [f]ees. One fifth of the total finder's fee shall be paid at closing and the balance paid in forty-eight (48) equal and consecutive monthly installments without interest commencing on the first day of the month following the closing.
 RBB Finder's Agreement, ¶ 2; RD Finder's Agreement, ¶ 2.

6. The Agreements provide:
 1. *Purchase or Sale.* [Stanton's] finder's fee shall be based on the Purchase Price and shall equal five percent (5%) of the first million dollars, four percent (4%) of the second million

dollars, three percent (3%) of the third million dollars, two percent (2%) of the fourth million dollars and one percent (1%) of each additional million dollars of the Purchase Price. [Stanton] will receive payment when and as the Purchase Price is paid.
 RBB Finder's Agreement, ¶ 1; RD Finder's Agreement, ¶ 1.

7. The Agreements provide:
 6. *Acceleration:* If [RD or RBB] should fail to make any payment to [Stanton] when due, and thirty (30) days after ... written notice of [such] failure [RD or RBB] still have not made the payment, then [Stanton] may by written notice accelerate [the] obligation to pay the balance of [RD or RBB's] finder's fees, on the assumption that all future payments due with respect to the underlying transaction have been made.
 RD Finder's Agreement, ¶ 6; RBB Finder's Agreement, ¶ 6.

### C. *The Complaint*

The Complaint alleges breach of contract, in Claim One and Claim Two, recovery as a third party beneficiary, in Claim Three, recovery under Section 14A:10–6(e) of the New Jersey Business Corporation Act, in Claim Four, quantum meruit, in Claim Five and Claim Six, unjust enrichment, in Claim Seven and Claim Eight, tortious interference, in Claim Nine and Claim Ten and fraud, in Claim Eleven.[8] Complaint, ¶¶ 26–75.

In his instant motion, Stanton moves for partial summary judgment on his breach of contract, third party beneficiary and Section 14A:10–6(e) of the New Jersey Business Corporation Act Claims, Claims One through Four of the Complaint. Claim One and Claim Two allege Stanton is entitled to recover $105,000.00 for breach of the RD Finder's Agreement and $105,000.00 for Breach of the RD/RBB Finder's Agreement. Complaint, ¶¶ 26–39. The Third Claim alleges Stanton as a creditor of RBB is entitled to enforce his claim for $105,000.00 against RD/RBB because the Merger Agreement "provides for an assumption by RD/RBB of all obligations and liabilities of RBB and specifically provides that creditors of RBB may enforce their claims against RD/RBB." *Id.,* ¶¶ 40–43. The Fourth Claim alleges RD/RBB is liable to Stanton for $210,000.00 because RBB and RD/RBB merged pursuant to the New Jersey Business Corporation Act which provides in Section 14A:10–6(e): " 'The surviving or new corporation shall be liable for all obligations and liabilities of each of the corporations so merged or consolidated....' " Complaint, ¶¶ 44–47 (quoting N.J.S.A. § 14A:10–6(e)).

Defendants, in their cross-motion for partial summary judgment, contend that, under the circumstances surrounding the instant action, the Agreements are void as against public policy. Opp. Brief at 1; Defendants' Reply Brief at 1–2. Defendants allege Stanton had a conflict of interest by not disclosing to the Defendants that he would only introduce parties to a potential transaction with whom Stanton had a finder's agreement. Opp. Brief at 1; Defendants' Reply Brief at 1–2.

Additionally, in opposition to Stanton's motion for partial summary judgment, Defendants contend there exists a genuine issue of material fact regarding the duty owed by Stanton to RBB, the first party contacted, to find suitable candidates for a transaction and not to limit those candidates to those with whom Stanton had finder's agreements. Opp. Brief at 17–18; Defendants' Reply Brief at 7. According to the Defendants, other issues of material fact, which should preclude summary judgment, concern the form of the Transaction, Opp. Brief at 19–20; Defendants' Reply Brief at 8–10, and the appropriateness of Stanton's demand for acceleration of alleged monies owed. Opp. Brief at 21; Defendants' Reply Brief at 10.

Because summary judgment is granted with respect to Stanton's breach of contract claims, Claim One and Claim Two of the Complaint, his other claims in the instant motion are not addressed. Stanton is only entitled to a single recovery of the two finder's fees under the Agreements. Accordingly, it is not necessary to address his other claims, in the instant motion, which seek the same finder's fees under different theories of relief.

### Discussion

#### A. *Standard of Review for Pro Se Submissions*

*Pro se* submissions "must be held to 'less stringent standards than formal pleadings

---

**8.** RD/RBB also instituted a related action (the "RD/RBB Action") by the filing of a complaint (the "RD/RBB Complaint"), on 26 April 1994, in the Superior Court of New Jersey seeking a declaratory judgment against Stanton. *See* RD/RBB Complaint. The RD/RBB Complaint seeks judgment declaring that the Agreements are void and unenforceable pursuant to public policy, that Stanton is entitled to only one finder's fee, that the Transaction was a purchase as to the interests of Rich, Baker and Berman and that the debt was improperly accelerated. *Id.,* ¶ 21.

Stanton filed a Notice of Removal, on 7 June 1994 (the "Notice of Removal"), to remove the RD/RBB Action to the United States District Court for the District of New Jersey. *See* Notice of Removal. The RD/RBB Action was assigned to this court on 7 June 1994. *See* Notice of Allocation and Assignment. On 27 June 1994, Stanton filed an Answer to the RD/RBB Complaint. It appears from a review of the file of the Clerk of the Court that no further action has been taken in this matter.

drafted by lawyers.' " *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *see also Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652, *reh'g denied,* 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972); *United States v. Day,* 969 F.2d 39, 42 (3d Cir.1992); *Lewis v. Attorney Gen. of United States,* 878 F.2d 714, 722 (3d Cir.1989).

### B. *Summary Judgment Standard of Review*

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993) ("Summary Judgment is only appropriate where there is no genuine issue of material fact for the jury to decide."); *Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party' ") (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict of a material fact is present in the record"); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir. 1991) (summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

■ All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Pastore v. Bell Tel. Co.,* 24 F.3d 508, 511–12 (3d Cir.1994); *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). "Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

■ Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with *"specific facts showing that there is a genuine issue for trial."* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied sub nom., Roselle v. Brown,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the non-

moving party for a jury to return a verdict for that party").

The Supreme Court elaborated on the summary judgment standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2552–53 (footnote omitted); *see also Pastore,* 24 F.3d at 511 ("nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact"); *Coolspring Stone Supply,* 10 F.3d at 148 ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Aronow Roofing Co. v. Gilbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

### C. Standard for Determining Choice of Law

In the instant motion, the Agreements provide New York law shall govern their enforcement. RBB Finder's Agreement, ¶ 14; RD Finder's Agreement, ¶ 14. Accordingly, evaluation of the instant cross-motions for partial summary judgment must begin with a choice of law analysis.

■ A Federal court, in a diversity case, must apply the law of the state in which the court sits to resolve substantive questions of state law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Micromanolis v. Woods School, Inc.,* 989 F.2d 696, 698 (3d Cir.1993); *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 487 (3d Cir.1985). When determining which state's substantive law to apply, a Federal court, in a diversity action, applies the choice of law rules of the forum state. *See Van Dusen v. Barrack,* 376 U.S. 612, 645–46, 84 S.Ct. 805, 823–24, 11 L.Ed.2d 945 (1964); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *David B. Lilly Co. v. Fisher,* 18 F.3d 1112, 1117 (3d Cir.1994); *Shuder v. McDonald's Corp.,* 859 F.2d 266, 269 (3d Cir.1988). Accordingly, New Jersey choice of law rules will control in the instant action.

■ "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice...." *Instructional Sys., Inc. v. Computer Curriculum Corp.,* 130 N.J. 324, 341, 614 A.2d 124 (1992); *accord Haynoski v. Haynoski,* 264 N.J.Super 408, 413, 624 A.2d 1030 (App.Div.1993); *Citibank, N.A. v. Errico,* 251 N.J. Super 236, 243, 597 A.2d 1091 (App.Div.1991); *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.,* 208 N.J.Super 666, 672, 506 A.2d 817 (App. Div.1986); *Newcomb v. Daniels, Saltz, Mongeluzzi & Barrett, Ltd.,* 847 F.Supp. 1244, 1248 (D.N.J.1994); *North River Ins. v. Philadelphia Reinsurance Corp.,* 831 F.Supp. 1132, 1140–41 (D.N.J.1993); *Conopco, Inc. v. McCreadie,* 826 F.Supp. 855, 864 (D.N.J. 1933), *aff'd,* 40 F.3d. 1239 (3d Cir.1994); *Apollo Technologies Corp. v. Centrosphere Indus.,* 805 F.Supp. 1157, 1190 n. 45 (D.N.J. 1992).

■ Under New Jersey law, a choice of law provision will not be honored if the state chosen has no substantial relationship to the transaction or the parties, or application of the law chosen would conflict with a fundamental public policy of a state having a greater interest in a determination of a particular issue and such state would be applicable in the absence of the choice of law provision under the governmental-interest analy-

sis.[9] *Newcomb*, 847 F.Supp. at 1248 (quoting Restatement (Second) of Conflicts of Laws § 187); *Conopco*, 826 F.Supp. at 864; *Apollo Technologies*, 805 F.Supp. at 1190 n. 45; *Instructional Sys.*, 130 N.J. at 324, 341–42, 614 A.2d 124.

■ In the instant case, the first part of the above exception does not apply because Stanton is a citizen of New York and, therefore, New York law has a "substantial relationship to the parties." *Instructional Sys.*, 130 N.J. at 324, 342, 614 A.2d 124 (explaining that because one of the parties, a Delaware corporation, was headquartered in California, California law had a substantial relationship to the parties).

It appears no fundamental policy of New Jersey would be offended by applying New York law. *Cf. Newcomb*, 847 F.Supp. at 1249 ("[C]hoice of another state's law would violate New Jersey public policy. New Jersey has a strong public interest in regulating the economic relationship between New Jersey attorneys and their clients in tort cases."); *Conopco*, 826 F.Supp. at 866 (as a matter of New Jersey public policy, tort claims could not be assigned; parties, therefore, could not create rights of assignability of tort claims in New Jersey, the state where cause of action arose, by entering into contract for such assignment in another state).

New Jersey has expressed a public policy interest in the compensation of New Jersey domiciliaries who have been victims of wrongdoing. *See Pine*, 201 N.J.Super. at 192, 492 A.2d 1079; *Washington v. Systems Maintenance Corp.*, 260 N.J.Super. 505, 510, 616 A.2d 1352 (App.Div.1992). "That 'compensation' policy reflects the underlying governmental interest that the injured domiciliary 'not become a charge on its society and that he be restored, if possible, to productivity.'" *Pine*, 201 N.J.Super. at 192, 492 A.2d 1079 (quoting *Schum v. Bailey*, 578 F.2d 493, 501 (3d Cir.1978) (Gibbons, J., concurring)).

For example, in *Pine*, the plaintiff lived in New York at the time the cause of action arose in New York. 201 N.J.Super. 186, 492 A.2d 1079. Subsequently, the plaintiff moved from New York to New Jersey and brought the suit in New Jersey. The court found that if a plaintiff is a bona fide New Jersey

---

**9.** New Jersey courts have rejected the historical approach of resolving choice of law questions by rigidly applying the law of the forum where the wrong occurred, known as the *lex loci delicti* approach. *See D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 523, 628 A.2d 305 (1993); *Veazey v. Doremus*, 103 N.J. 244, 247, 510 A.2d 1187 (1986). The traditional rule was abandoned in favor of the more flexible "governmental-interest" analysis set forth in the Restatement (Second) of Conflict of Laws § 188 (1971) ("Restatement"). *See McFarland v. Miller*, 14 F.3d 912, 917 (3d Cir.1994) (citing *Veazey*, 103 N.J. at 247, 510 A.2d 1187); *Pancza v. Remco Baby, Inc.*, 761 F.Supp. 1164, 1168 (D.N.J.1991) (citing *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34, 417 A.2d 488 (1980)); *see Mueller v. Parke Davis*, 252 N.J.Super. 347, 350, 599 A.2d 950 (App.Div.1991); *Van Slyke v. Worthington*, 265 N.J.Super. 603, 610, 628 A.2d 386 (Law Div.1992).

The current standard focuses on determining which state has the more significant connections with the transaction and the parties. *See McFarland*, 14 F.3d at 917; *Rohm & Haas Co. v. Adco Chem Co.*, 689 F.2d 424, 429 (3d Cir.1982); *Pancza*, 761 F.Supp. at 1168; *see, e.g., State Farm*, 84 N.J. at 34, 417 A.2d 488; *Mueller*, 252 N.J.Super. at 350–51, 599 A.2d 950. A court must consider, first, the governmental policies of the conflicting jurisdictions as reflected in the laws involved and, second, the factual connec-

tions among the parties and the related jurisdictions. *D'Agostino*, 133 N.J. at 523, 628 A.2d 305; *see State Farm*, 84 N.J. at 34, 417 A.2d 488; *Mueller*, 252 N.J.Super. at 351, 599 A.2d 950; *Deemer v. Silk City Textile Mach. Co.*, 193 N.J.Super. 643, 649, 475 A.2d 648 (App.Div.1984); *McFarland*, 14 F.3d at 917; *Petrella v. Kashlan*, 826 F.2d 1340, 1343 (3d Cir.1987); *Pancza*, 761 F.Supp. at 1168; *Hoffman Equip., Inc. v. Clark Equip. Co.*, 750 F.Supp. 1222, 1229 (D.N.J.1990), *aff'd mem.*, 935 F.2d 1281 (3d Cir.1991).

"If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative nature of a state's contacts ultimately determines whether its law should apply." *D'Agostino*, 133 N.J. at 523, 628 A.2d 305; *see Veazey*, 103 N.J. at 248, 510 A.2d 1187; *Van Slyke*, 265 N.J.Super. at 613, 628 A.2d 386; *Mueller*, 252 N.J.Super. at 351, 599 A.2d 950; *Pine v. Eli Lilly & Co.*, 201 N.J.Super. 186, 192, 492 A.2d 1079 (App.Div.1985); *David B. Lilly Co.*, 18 F.3d at 1119; *Petrella*, 826 F.2d at 1343; *Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28, 32 (3d Cir. 1975); *Hoffman*, 750 F.Supp. at 1229. A state is considered interested in a matter only if the application of its law to the facts of a particular case will further the state's policies. *D'Agostino*, 133 N.J. at 523, 628 A.2d 305; *Hoffman*, 750 F.Supp. at 1229.

domiciliary, the state has a significant governmental interest in the compensation of that plaintiff. *Id.* at 193, 492 A.2d 1079; *see David B. Lilly Co.*, 18 F.3d at 1119; *Warner v. Auberge Gray Rocks Inn, Ltee.*, 827 F.2d 938, 941 (3rd Cir.1987). This interest is particularly compelling in tort actions where the "primary purpose . . . is to compensate plaintiffs for their injury." *Henry*, 508 F.2d at 33; *see Mellk v. Sarahson*, 49 N.J. 226, 226, 229 A.2d 625 (1967); *Pine*, 201 N.J.Super. at 193, 492 A.2d 1079; *Schum*, 578 F.2d at 501–03. "In most instances, [New Jersey] courts, as well as the Third Circuit, have favored applying New Jersey law when the plaintiff is domiciled in New Jersey." *Pine*, 201 N.J.Super. at 193, 492 A.2d 1079.

In the instant case, however, Stanton is a citizen of the state of New York and has neither lived nor maintained a place of business in New Jersey. Complaint, ¶ 1; Defendants' 12(G) Statement, ¶ 1. New Jersey, therefore, has no interest in protecting Stanton or compensating him for his alleged injuries.

There appears to be no case expressing a broad interest on the part of either New Jersey or New York in suits for breach of a finder's fee agreement. Courts faced with a choice between the plaintiff's domicile and the defendant's domicile, typically choose the plaintiff's domicile as the one having the more significant interest in the action. *See Mueller*, 252 N.J.Super. at 355, 599 A.2d 950; *see, e.g., Heavner*, 63 N.J. at 141, 305 A.2d 412; *Rose v. Port of New York Authority*, 61 N.J. 129, 140, 293 A.2d 371 (1972); *Pine*, 201 N.J.Super. at 194, 492 A.2d 1079; *Deemer*, 193 N.J.Super. at 651–52, 475 A.2d 648; *Allen v. Volkswagen of Am., Inc.*, 555 F.2d 361, 364 (3d Cir.1977); *Henry*, 508 F.2d at 33.

In addition to the comparative weight normally given to the plaintiff's domicile, there is little reason in the instant case to favor the domicile of the Defendants for deterrence reasons.[10] The allegations in the Complaint refer to the obligations of RD and RBB under the Agreements they signed with a single out-of-state individual. There is no implication of any large scale state interest in protecting similarly situated individuals from wrongful conduct. *See Deemer*, 193 N.J.Super. at 650–51, 475 A.2d 648. Accordingly, it appears New Jersey does not have a greater interest in a determination of the issues in the instant motion.

In light of New York's substantial relationship to the parties, and the absence of any conflicting New Jersey policy or a greater interest in New Jersey, New York law will be applied in the instant action.[11]

---

10. Courts have recognized that states do have some interest in deterring their residents from wrongdoing. As articulated by the New Jersey Supreme Court in *Pfau:* "A state should not only be concerned with the protection and self-interest of its citizens;" it also has an interest in assuring that its residents perform their duties and obligations. 55 N.J. at 524–25, 263 A.2d 129; *see Mueller*, 252 N.J.Super. at 354, 599 A.2d 950. Specifically, a defendant's domicile has an interest "in seeing that its domiciliaries are held to the full measure of damages or the standard of care [for] which the state's law provide[s]." *Pfau*, 55 N.J. at 524, 263 A.2d 129; *see Pine*, 201 N.J.Super. at 192, 492 A.2d 1079. This policy is based on the premise that "exacting compensation from a wrongdoer will deter his future misconduct, and is ordinarily associated 'with the sovereignty in which past conduct took place and in which future misconduct may occur.'" *Pine*, 201 N.J.Super. at 192, 492 A.2d 1079 (quoting *Schum*, 578 F.2d at 501).

11. It is not necessary, therefore, to conduct a governmental-interest analysis because the instant action does not meet the other criteria necessary to override the parties' choice of law.

*See Newcomb*, 847 F.Supp. at 1248 ("Under New Jersey law, . . . the courts will generally honor [a choice of law provision in a contract], unless: 'the chosen state has no substantial relationship to the parties or the transaction . . . or . . . the law of the chosen state would be contrary to a fundamental policy of a state *which has a materially greater interest . . . and which . . .* would be the [otherwise] applicable law : . .' [under the governmental-interest analysis]." (quoting Restatement (Second) of Conflicts of Laws § 187) (emphasis added)). It appears, however, under the governmental-interest analysis, the result would be the same.

Also, as demonstrated further below, it appears the resolution of the issues in the instant motion would be no different under New York or New Jersey law.

Additionally, neither the Defendants nor Stanton dispute the propriety of applying New York law to the instant action; both have briefed New York and New Jersey law. In fact, Defendants argue that "New York's highest Court's decision in . . . [a particular case] is controlling." Defendants' Reply Brief at 6. *See Apollo Technologies*, 805 F.Supp. at 1190 n. 45 ("Because the parties

### D. *The Breach of Contract Claims*

The appropriateness of the motion for partial summary judgment by Stanton on his breach of contract claims is, in the first instance, dependent on an analysis of the Defendants' cross-motion alleging portions of the Agreements are void as against public policy.

### E. *Public Policy*

■ "[O]ne who signs a written agreement is conclusively bound by its terms unless fraud, duress or some other unlawful act on the part of a party, ... is demonstrated." *Agristor Leasing v. Barlow*, 180 A.D.2d 899, 579 N.Y.S.2d 476, 479 (App.Div.1992); *State Bank of India v. Patel*, 167 A.D.2d 242, 561 N.Y.S.2d 740, 741 (App.Div.1990); *see also Shochat v. Weisz*, 797 F.Supp. 1097, 1104 (E.D.N.Y.1992) (explaining that under New York law "[g]enerally, one who signs a written instrument is conclusively bound by its terms," even if one fails to read the document); *Austin v. Canbar Assoc., Inc.*, 175 A.D.2d 195, 572 N.Y.S.2d 339, 340 (App.Div. 1991) (" 'when parties set their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms' " (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990))).[12]

■ "Courts have rarely found a clause to be unconscionable in a commercial contract." *American Dredging Co. v. Plaza Petroleum Inc.*, 799 F.Supp. 1335, 1339 (E.D.N.Y.1992). The *American Dredging* court explained:

"When the contract is between two commercial entities, unconscionability must be viewed 'in light of the general commercial background and the commercial needs of the particular trade or case,' and there is a presumption of conscionability when the contract is between businessmen in a commercial setting." *Id.; see also In re Davis v. Suderov*, 169 B.R. 285, 304 (E.D.N.Y.1994) ("Under New York law, to be found unconscionable a contract must be so grossly unreasonable in light of the mores and business practices of the time and place as to be unenforceable.").

■ Defendants, in their cross-motion for partial summary judgment, contend that under the circumstances of the instant action the Agreements are void as against public policy. Opp. Brief at 1; Defendants' Reply Brief at 1–2. Defendants allege "Stanton's attempt to obtain two finder's fees from both sides to the [T]ransaction without revealing to his initial client, RBB, that he was presenting its name only to other firms with which he also had a [f]inder's [a]greement, created an irreconcilable conflict of interest." Defendants' Reply Brief at 1–2.

According to Defendants:

[W]hen [Stanton] approached ... RD, he did not disclose ... the name of the firm (RBB) interested in being acquired until after he obtained a finder's fee agreement from RD.... [Stanton's] conduct infers he would not have disclosed ... the identity of RBB had RD not signed on with [Stanton]. Thus, an inference can be

chose New York law to apply to the [a]gency [c]ontracts and because they apply New York law in their submissions, New York law will be applied....").

**12.** The same is true under New Jersey law: "Generally, 'courts should enforce contracts as made by the parties.' " *Marchak v. Claridge Commons, Inc.*, 134 N.J. 275, 281, 633 A.2d 531 (1993) (quoting *Vasquez v. Glassboro Serv. Ass'n*, 83 N.J. 86, 101, 415 A.2d 1156 (1980)).

According to the Third Circuit, when interpreting

a written agreement, we are bound by its terms, and our role is to discern the "general purpose of the agreement, as expressed by the words employed, when read and construed as a whole." *Goldberg v. Commercial Union Ins. Co.*, 78 N.J.Super 183, 190, 188 A.2d 188 (App.

Div.1963). In performing this task, it is our function to "enforce it [the contract] as written and not to make a better contract for either of the parties." *Klacik v. Kovacs*, 111 N.J.Super 307, 311, 268 A.2d 305 (App.Div.1970). *Vanguard Telecommunications v. Southern New England Tel. Co.*, 900 F.2d 645, 651 (3d Cir. 1990) (alteration in original); *see also Freedman Truck Center v. General Motors Corp.*, 784 F.Supp. 167, 178 (D.N.J.1992) ("[T]he 'function of the court is to enforce the [agreement] as written, not to write for the parties a different or better contract.' " (quoting *Liqui-Box Corp. v. Estate of Elkman*, 238 N.J.Super 588, 599–600, 570 A.2d 472 (App.Div.), *cert. denied*, 122 N.J. 142, 584 A.2d 214 (1990))); *Saxon Const. v. Masterclean*, 273 N.J.Super 231, 235, 641 A.2d 1056 (App.Div.) ("[P]arties bargaining at arms-length may generally contract as they wish."), *cert. denied*, 137 N.J. 314, 645 A.2d 142 (1994).

drawn that [Stanton] would not and did not release the name of RBB to anyone with whom he did *not* have a finder's agreement.

Opp. Brief at 8 (emphasis in original). As a result of this alleged conflict of interest, Defendants contend Stanton should not be entitled to any fee under the Agreements or, alternatively, only a single fee. *Id.* The Defendants further contend that public policy required Stanton to inform RBB that he was presenting its name only to firms with whom he had a finder's agreement, rather than simply to the most suitable candidates. *Id.* at 8–9. Defendants argue these considerations of public policy "outweigh the law's traditional interest in enforcing a freely-entered contract because [Stanton] withheld a material fact from RBB when he entered into the [RBB Finder's] Agreement...." *Id.* at 9.

Defendants acknowledge, however, that there is little support for their public policy argument. *Id.* ("Except in the scope of real estate broker transactions, research has revealed few published opinions concerning a finder's conduct inimical to the public interest or detrimental to the common good.").

The only New York case Defendants cite in support of their public policy argument is *Denburg v. Parker Chapin Flattau & Klimpl,* 82 N.Y.2d 375, 604 N.Y.S.2d 900, 624 N.E.2d 995 (1993), and then only to dispute Stanton's interpretation of the case. Defendants Reply Brief at 5–6. In *Denburg,* the court held that a law firm partnership agreement which required partners to pay the partnership a fee, upon withdrawal, was unenforceable as against public policy. *Denburg,* 82 N.Y.2d at 382, 604 N.Y.S.2d 900, 624 N.E.2d 995. The *Denburg* court based its public policy determination on the effect of the clause at issue to deter competition for attorney services and to impinge upon a clients' choice of counsel. *Id.* at 381, 604 N.Y.S.2d 900, 624 N.E.2d 995. Because the finder's fees under the Agreements do not implicate any comparable concerns, *Denburg* is distinguishable from the instant action.

Despite finding the clause against public policy, however, the *Denburg* court held that an agreement to settle the dispute could be enforced—even if the underlying agreement could not be. *Id.* at 385, 604 N.Y.S.2d 900, 624 N.E.2d 995. Stanton contends, under *Denburg,* the LaForgia Letter, which acknowledged Stanton's right to a finder's fee from both RBB and RD/RBB (although such fees were based on the Transaction as a purchase rather than a merger), and the attempted payment of both finder's fees, precludes the assertion of a public policy argument made after such tender was rejected. Stanton Reply Brief at 8.

It appears unnecessary, and perhaps inappropriate, to extend *Denburg* this far. Nonetheless, it appears the actions of Defendants, acknowledging the obligations under both finder's agreements prior to the dispute as to the amount owed under each,[13] weighs against their public policy argument and their request for invalidation of the Agreements.

Defendants also cite two distinguishable New Jersey cases, *Vasquez* and *Saxon.* In *Vasquez,* at issue was an employment contract which failed to give a migrant farmworker a reasonable time to find shelter after being terminated and, at the same time, asked to leave the employer supplied living quarters. 83 N.J. at 103–04, 415 A.2d 1156. The New Jersey Supreme Court held: "The inherent inequity of the contract arouses a sense of injustice and invokes the equitable powers of the courts. In the absence of any concern demonstrated for the worker in the contract, public policy requires the implication of a provision for a reasonable time to find alternative housing." *Id.* at 104–05, 415 A.2d 1156. None of the same concerns, specifically the welfare of a contracting party in a far inferior bargaining position, are present in the instant case. Accordingly, the holding

---

**13.** As indicated, in response to notices of default, on or about 26 March 1994, LaForgia sent Stanton a check for $3,854.00 purporting to represent the full amount owed under the Agreements by the Defendants based on the Defendants' contention that there was not a complete merger of RBB's practice. Stanton Aff., ¶ 34; Defendants' 12(G) Statement, ¶ 29; LaForgia Letter (explaining Defendants' calculation of amount owed).

in *Vasquez* provides no support for the Defendants' position.

In *Saxon*, a provision of a construction contract entitled a defaulting subcontractor to the difference between what the general contractor had to pay someone else to complete the work and what was still owed on the contract absent the breach. 273 N.J.Super at 235, 641 A.2d 1056. Alternatively, if the cost of finishing the work exceeded the unpaid balance, the provision required the subcontractor to pay the difference to the general contractor. *Id.*

The Appellate Division in *Saxon* affirmed the trial court holding that such provision was against public policy because it resulted in unjust enrichment and economic waste. *Id.* at 238, 641 A.2d 1056. The provision "encourage[d] the subcontractor to breach its agreement where it knows that its services can be purchased ... [for] less than the contract price[,] ... provide[s] the defaulting subcontractor with a windfall ... [a]nd it discourages the contractor from affirmatively seeking to minimize its losses by obtaining a [cheaper] substitute...." *Id.* at 237–38, 641 A.2d 1056.

Even assuming Stanton only presented RBB's name to firms which signed a finder's agreement, this would not encourage breach of the Agreements as did the contract provision in *Saxon*. Accordingly, *Saxon* is not helpful in the present inquiry.[14]

Under the Agreements, Stanton is entitled to a finder's fee only if an eventual transaction takes place between the parties he brought together.[15] The parties he introduces must agree that a transaction is in their mutual best interests before Stanton earns any compensation. Also, Stanton would not be entitled to a fee if the parties found more suitable entities on their own or through the effort of someone else because the Agreements were non-exclusive.[16]

Accordingly, irrespective of the possibility of getting a finder's fee from both parties, a possibility which was expressly provided for under the Agreements and contemplated by the parties,[17] it was in the best interests of Stanton to perform under the Agreements and perform well to find candidates which the parties would agree were proper suitors.

In the absence of a clear violation of public policy under New York law, invalidating any portion of the Agreements is inappropriate.[18] *F.D.I.C. v. American Casualty Co.*, 998 F.2d 404, 409 (7th Cir.1993) ("The power to deny enforcement of contract terms on public policy grounds is restricted to those situations in which the contract would violate 'some explicit public policy, that is well-defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not

14. Defendants also cite *Burton v. Pet, Inc.*, 509 S.W.2d 95 (Mo.1974). *Burton* is unpersuasive because it is decided under Missouri law and is factually distinguishable from the instant case. In *Burton*, an agent, employed by a corporation to find a purchaser, negotiated a secret agreement with a potential purchaser to stall negotiations with a competing would-be purchaser. *Id.* at 98–99. The court held the secret agreement was against public policy because "[t]here is scarcely a rule of law which has received more uniform approval than that an agent cannot serve the opposing party without the knowledge and consent of his principal." *Id.* at 99 (quoting *Winter v. Carey*, 127 Mo.App. 601, 106 S.W. 539 (1907)).

15. The Agreements provide: "**Under no circumstances will [RBB and RD] be obligated to pay [Stanton] a finder's fee for any [t]ransaction, unless and until it closes. [RBB and RD] shall be free to reject without explanation any and all [p]ersons [p]resented by [Stanton].**" RBB Finder's Agreement (emphasis in original); RD Finder's Agreement (emphasis in original).

16. "[RBB and RD] shall be free to solicit transactions on [there] own without liability or obligation to [Stanton]." RBB Finder's Agreement, ¶ 7; RD Finder's Agreement, ¶ 7.

17. The Defendants acknowledge: "It is undisputed that [the] Agreements at [p]aragraph 8 state that [Stanton] 'may ... receive compensation from the other party to the transaction.'" Opp. Brief at 6. Also, it is undisputed that the RBB Finder's Agreement was modified by the 21 January Letter providing: "[Stanton] will not receive a finder's fee from the other party that is different from the finder's fee [RBB is] paying [Stanton]." 21 January Letter; Defendants' 12(G) Statement, ¶ 7.

18. It appears the Defendants have similarly failed to identify any violation of public policy under New Jersey law which would support their position.

from general considerations of supposed public interest.' " (quoting *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987))); *accord L & E Corp. v. Days Inns of Am., Inc.,* 992 F.2d 55, 58 (4th Cir.1993); *F.D.I.C. v. American Casualty Co.,* 975 F.2d 677, 681 (10th Cir.1992); *Fidelity & Deposit Co. of Maryland v. Conner,* 973 F.2d 1236, 1241 (5th Cir.1992); *Swenson v. Management Recruiters Int'l, Inc.,* 872 F.2d 264, 267 (8th Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989); *Goodwin v. George Fischer Foundry Sys., Inc.,* 769 F.2d 708, 713 (11th Cir.1985). Indeed, were it routine for courts to refuse to enforce unambiguous contracts, based solely upon some subjective notion of public policy, a written contract would no longer provide parties with the stability and assurances essential to encourage commercial relations. *See St. Paul Mercury Ins. Co. v. Duke Univ.,* 849 F.2d 133, 135 (4th Cir.1988). Accordingly, the Defendants' cross-motion for partial summary judgment is denied.

F. *Alleged Existence of Genuine Issues of Material Fact to Preclude Stanton's Motion For Partial Summary Judgment on His Breach of Contract Claims*

Given that the Agreements are not void as against public policy, it must be determined if any genuine issues of material fact exist to prevent Stanton from recovering on his breach of contract claims, pursuant to Claim One and Claim Two of the Complaint. Defendants, contend such genuine issues exist regarding an alleged duty owed by Stanton, the nature of the Transaction and whether the alleged debt was properly accelerated.

1. *Duty Owed by Stanton to RBB*

 In opposition to Stanton's motion for partial summary judgment, Defendants' contend there exists a genuine issue of material fact regarding the duty owed by Stanton to RBB, the first party contacted, to find suitable candidates for a transaction and not to limit those candidates to those with whom Stanton had a finder's agreement. Opp. Brief at 17–18; Defendants' Reply Brief at 7.

Defendants contend, at most, Stanton should be entitled to recover only one fee. Opp. Brief at 16. Defendants rely on *Northeast General Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993), to support their argument, as does Stanton in opposition.

In *Northeast General,* the New York Court of Appeals held that a contract between a corporation and a finder, under which the finder was to find and present potential purchasers of the corporation, did not impose a fiduciary-like duty upon the finder to disclose adverse information regarding a prospective purchaser introduced by the finder. *Id.* at 162, 604 N.Y.S.2d 1, 624 N.E.2d 129. The *Northeast General* court explained:

[A] fiduciary relationship does not arise by operation of law, but must spring from the parties themselves.... Unless the particular agreement establishes a relationship of trust, one will not spring from a finder's contract in and of itself, for without some agreed-to nexus, there is no relationship of trust and, thus no duty of highest loyalty.

*Id.* at 160, 604 N.Y.S.2d 1, 624 N.E.2d 129. According to the court, "[u]ltimately, the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties." *Id.* at 163, 604 N.Y.S.2d 1, 624 N.E.2d 129.

In *Northeast General,* the finder's agreement stated the finder was to act " 'as a nonexclusive independent investment banker and business consultant for the purposes of finding and presenting candidates for purchase, sale, merger, or other business combination.' " *Id.* at 160–61, 604 N.Y.S.2d 1, 624 N.E.2d 129. Nonetheless, by its terms, the finder had no power to bind the corporation or to negotiate the transaction, but only had the authority to introduce prospects and would get paid only if a transaction resulted from such introduction. *Id.* at 161, 164, 604 N.Y.S.2d 1, 624 N.E.2d 129. The *Northeast General* court, concluding that imposition of a fiduciary-like duty was inappropriate, explained:

Probing our precedents and equitable principles unearths no supportable justification for ... a judicial interposition [of a fiduciary-like ,duty,] however highly motivated and idealistic. Indeed, responding to this fine instinct would inappropriately propel the courts into reformation of service agreements between commercially knowledgeable parties in this and perhaps countless other situations and transactions as well.

*Id.* at 162, 604 N.Y.S.2d 1, 624 N.E.2d 129.

In the instant case, just as in *Northeast General,* the Agreements did not give Stanton the power to bind or negotiate, but simply to present candidates for a potential transaction. Accordingly, it is also improper to impose any fiduciary-like duty on Stanton in the instant action.[19]

The Defendants also . contend Stanton is not entitled to fees under the Agreements because "[w]here fairness and justice require, the [c]ourt may impose upon a contract a duty required to effectuate the implied covenant of good faith and fair dealing necessarily involved in the parties' contractual relationship." Opp. Brief at 16. In support of this contention, the Defendants rely on *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) and *Wieder v. Skala,* 80 N.Y.2d

628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992), both of which are factually distinguishable from the instant case.[20]

Even assuming, as the Defendants contend, that Stanton only presented names of potential buyers who had signed a finder's agreement, the Defendants, have failed to provide any support for their contention that Stanton owed a duty to disclose such information and that Stanton is not entitled to two fees under the Agreements. Despite viewing the evidence in a light most favorable to the Defendants, they have failed to establish the existence of a genuine issue of material fact regarding such duty owed by Stanton under the Agreements which would preclude him from recovering both finder's fees.[21] *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Accordingly, denial of Stanton's motion for partial summary judgment on his breach of contract claims is improper on this basis. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

Given the validity of the Agreements and the ability of Stanton to recover two fees, the next inquiry is whether, as Defendants contend, there exist genuine issues of material fact to preclude Stanton from recovering the full amount sought in his breach of contract claims. Defendants assert that such triable issues include the nature of the Transaction

**19.** Defendants argue that "the unequivocal understanding between the parties was that Stanton was to assist RBB in locating a buyer and in procuring a transaction in which Stanton's contacts, negotiation skills, and expertise would play a significant role." Defendant Reply Brief at 6–7. As *Northeast General* explained, however, it is the terms of the Agreements that govern. 82 N.Y.2d at 163, 604 N.Y.S.2d 1, 624 N.E.2d 129. The Agreements do not provide for Stanton to play any role except the role of finder.

Additionally, the Agreements provide: "This agreement is the sole and entire agreement between us. No representations, warranties, promises or inducements not set forth in this agreement shall be binding on either of us." RBB Finder's Agreement, ¶ 14; RD Finder's Agreement, ¶ 14. Moreover, the Defendants state in the instant action and in the RD/RBB Action that Stanton did nothing more than introduce RD and RBB. *See, e.g.,* LaForgia Aff., ¶ 12 ("Stanton did not assist RD in our negotiations 'nor did he assist in the preparation of any documents."); RD/RBB Complaint, ¶ 20A ("[Stanton] performed no services other than to introduce the parties").

**20.** In *Ashland,* the issue was the availability of lost profits for a employee who developed a mathematical model for his former employer's business. 82 N.Y.2d at 399, 604 N.Y.S.2d 912, 624 N.E.2d 1007. The *Ashland* court affirmed the lower court holding that the employer had breached its implied duty of good faith and fair dealing when it refused to sign a confidentiality agreement after the parties intended to be bound by a contract for the employees invention. *Id.* at 401–02, 604 N.Y.S.2d 912, 624 N.E.2d 1007. In *Wieder,* the court implied a lawyer's duty, to comply with the ethical standards of the profession, to the employment-at-will doctrine. 80 N.Y.2d at 635–36, 593 N.Y.S.2d 752, 609 N.E.2d 105.

**21.** As Stanton points out, having performed under the clear provisions of the Agreements, the Defendants cannot now defeat his right to compensation "by reference to illusory 'duties' and 'obligations' which the Defendants did not seek when they entered into the ... Agreements." Stanton Reply Brief at 13.

and the propriety of acceleration of the debt under the Agreements.

### 2. *Nature of the Transaction Between RD and RD/RBB*

■ According to the Defendants, there is a genuine issue of material fact, concerning the form of the Transaction, and therefore, the amount owed under the Agreements. Opp. Brief at 19–20; Defendants' Reply Brief at 8–10. Defendants contend the Transaction was a merger as to thirteen percent of RBB's practice and a purchase as to the remaining eighty-seven percent. Defendants' 12(G) Statement, ¶ 29; LaForgia Letter.

As discussed, Defendants argue: "Although the form of the [T]ransaction ... was that of a statutory merger, the [T]ransaction in substance was a purchase by RD/RBB of the interest[s] of ... Rich, Baker, and Berman, but was a merger of the interest[s] of Schwartz and Truppo...." Opp. Brief at 19. Defendants allege that the Transaction is structured so neither Rich Baker nor Berman receive the benefit of any future financial gains nor incur any risk of future loss and are paid in installments for their stock upon retirement. Rich Aff., ¶ 12.

The documents relevant to the Transaction, and the Defendants' arguments, fail to establish the existence of a genuine issue of material fact that would preclude Stanton's motion for partial summary judgment.

The Agreements define merger as "any consolidation, combination, affiliation, income or expense sharing relationship, merger or similar arrangement between two or more [p]ractices in which principals of the original [p]ractices continue to maintain relatively significant equity interests in the surviving entity." RBB Finder's Agreement, ¶ 10; RD Finder's Agreement, ¶ 10. A purchase or sale is defined as "any sale, purchase, redemption, termination or other transfer (other than a [m]erger), whether direct or indirect, of an interest in a [p]ractice, including an interest in a merged entity, and assets (including real estate) incidental to the [p]ractice." RBB Finder's Agreement, ¶ 10; RD Finder's Agreement, ¶ 10.

As mentioned, the Defendants concede the Merger Agreement, which repeatedly refers to the Transaction as a merger, provided for the merger of 100% of RBB into RD/RBB. Defendants' 12(G) Statement, ¶ 16; Merger Agreement at 4. Also, Defendants acknowledge: "Immediately following the consummation of the merger, the former principals of RBB owned 46 percent of the shares of ... RD/RBB, and had contributed 46 percent of its capital. The former principals of RD owned 54 percent of the shares of RD/RBB and had contributed 54 percent of its capital." Defendants' 12(G) Statement, ¶ 21. The Transaction is, therefore, a merger as defined by the Agreements because "the principals of the original [p]ractice[ ] [RBB] continue to maintain relatively significant equity interests in the surviving entity [RD/RBB]." RBB Finder's Agreement, ¶ 10; RD Finder's Agreement, ¶ 10.

The Merger Agreement itself does not support the Defendants' argument that the Transaction was only partially a merger, with the bulk classified as a purchase. Instead, the Merger Agreement states: "As of the Effective Date of the merger, the separate existence of RBB shall cease and it shall be *merged with and into RD/RBB* which shall be the [s]urviving [c]orporation." Merger Agreement at 4.

The Merger Agreement also provides: "RD/RBB and RBB will cause a [c]ertificate of [m]erger ... to be signed, verified and delivered to the Secretary of the State of New Jersey." *Id.* As discussed, the Defendants did file the Certificate of Merger. *See* Certificate of Merger. The Certificate of Merger, similar to the Merger Agreement, does not refer to the Transaction as a purchase. Rather, the Certificate of Merger states: "On the effective date of the merger, the separate existence of [RBB] shall cease and RD/RBB ... shall become the owner, without other transfer, of all of the rights and property of [RBB]. ..." *Id.*, ¶ 2.B.i.

The terms of the Stockholder Agreement, are also inconsistent with the Defendants' contention that the Transaction was a purchase as to Rich Baker and Berman, who were not to be paid until retirement. *See* Stockholder Agreement. According to the

Stockholder Agreement: "[RD/RBB] *merged* with ... RBB ... and the [Stockholder Agreement] make[s] provisions for the purchase and sale of the shares of capital stock of [RD/RBB] as herein set forth...." *Id.* at 2.

The Stockholder Agreement further provides:

### 9. *UNFUNDED RETIREMENT BENEFITS AGREEMENT.*

Contemporaneously with this [a]greement, [RD/RBB] has entered into an Unfunded Retirement Benefits Agreement [the "Retirement Agreements"] with *each* of its [s]tockholders. *Payments to be made under th[e] [Retirement] Agreement, if any, are not to be deemed a payment attributable to the purchase price for shares....*

*Id.,* ¶ 9 (emphasis added). Moreover, the Retirement Agreement, *see* Exhibit 10 to the Stanton Aff., states: "[RD/RBB] wishes to make provision for retirement benefits for Employee and his dependents in the event of Employee's death, retirement, total disability or withdrawal...." *Id.* at 2.

While it appears that each stockholder of RBB signed the identical Retirement Agreement, Defendants, contend there is an important distinction which favors their purchase argument. Defendants' Reply Brief at 8. Defendants point out that under the Retirement Agreement the right to full retirement benefits attaches only after twenty years of service. *Id.* According to Defendants, therefore, Rich, Baker and Berman who have more than twenty years of service are entitled to such benefits, while Schwartz and Truppo, who have not yet reached the twenty year service mark, are not so entitled. *Id.* This argument is unconvincing, at best.

The Defendants' assertions and the Agreements, the Merger Agreement, the Certificate of Merger and the Stockholder Agreement, viewed in a light most favorable to the Defendants, fail to raise a genuine issue of material fact regarding the characterization of the Transaction as anything but a merger. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. Accordingly, denial of Stanton's motion for partial summary judgment on his

breach of contract claims is inappropriate on this ground. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### 3. *Acceleration of Debt*

■ The remaining inquiry regards the appropriateness of Stanton's demand for acceleration of the monies owed under the Agreements and whether, as Defendants contend, there exists a genuine issue of material fact that should preclude Stanton from recovering the full amount sought under the Agreements in his breach of contract claims. Opp. Brief at 21; Defendants' Reply Brief at 10.

The Agreements provide:

**6. *Acceleration:*** If [RD or RBB] should fail to make any payment to [Stanton] when due, and thirty (30) days after ... written notice of [such] failure [RD or RBB] still have not made the payment, then [Stanton] may by written notice accelerate [the] obligation to pay the balance of [RD or RBB's] finder's fees, on the assumption that all future payments due with respect to the underlying transaction have been made.

RD Finder's Agreement, ¶ 6; RBB Finder's Agreement, ¶ 6.

Defendants contend the language "on the assumption that all future payments due with respect to the underlying transaction have been made[,]" means Defendants can rebut such assumption that the payments have been made. Opp. Brief at 21. Further, Defendants contend "the assumption is overcome" because "no part of any purchase price has been paid." *Id.* Instead, as discussed, Defendants argue it will be paid upon retirement of certain individuals. *Id.* at 19; Rich Aff., ¶ 12.

In light of the above determination that the Transaction was a merger, this argument fails. The Defendants have not, therefore, established a genuine issue of material fact regarding the appropriateness of Stanton's acceleration of the monies owed that would preclude recovery on Stanton's breach of

contract claims.[22] *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

Accordingly, partial summary judgment is appropriate as to Stanton's breach of contract claims in Claim One and Claim Two of the Complaint.[23] It is not necessary, therefore, to address his other claims for relief in the instant motion.[24]

*Conclusion*

For the reasons set forth above, the motion by Stanton for partial summary judgment is granted; the cross-motion by Defen-

**22.** As discussed, the Defendants agree with Stanton that under the Agreements Stanton's compensation, in the event of merger, equals $105,-000.00, 20 percent of which or $21,000.00 due at closing and the balance in 48 monthly installments of $1,750.00 beginning 1 April 1994. Defendants' 12(G) Statement, ¶ 26; Stanton Aff., ¶ 30. It is undisputed that on 8 March 1994, Stanton sent both RBB and RD a bill for $21,-000.00, Defendants' 12(G) Statement, ¶ 28, and that on or about 23 March 1994, Stanton sent notices of default, pursuant to the Agreements, to the Defendants. Defendants' 12(G) Statement, ¶ 33; Stanton Aff., ¶¶ 32–33.

It is further undisputed that on or about 26 March 1994, LaForgia sent Stanton a check for $3,854.00 purporting to represent the full amount owed under the Agreements, Defendants' 12(G) Statement, ¶ 29; Stanton Aff., ¶ 34, that Stanton rejected such payment, Defendants' 12(G) Statement, ¶ 35; Stanton Aff., ¶¶ 35–36, and that on 25 April 1994, Stanton sent notices to the Defendants of the acceleration of the entire amount due under the Agreements. Defendants' 12(G) Statement, ¶ 36; Stanton Aff., ¶ 39.

Additionally, it is clear that the check for $3,854.00, or approximately nine percent of the $42,000 due at closing, was not a valid tender which would preclude acceleration. *See Hudson City Sav. Inst. v. Burton,* 88 A.D.2d 728, 451 N.Y.S.2d 855, 856 (App.Div.1982) (right to exercise acceleration option was not undermined by attempted tender of less than the amount due); *Jamaica Sav. Bank v. Sutton,* 42 A.D.2d 856, 346 N.Y.S.2d 847, 848 (App.Div.1973) (holding that a mere offer, absent payment of the amount due, was not a valid tender, which "requires not only readiness and ability to perform, but actual production of the thing to be delivered" or payment of the amount owed); *Regan v. Tally Ho Trucking Co.,* 103 Misc.2d 269, 425 N.Y.S.2d 725, 728 (Civ.Ct., Bronx 1980) (explaining that an attempted tender of rent owed was improper when among other things it was "for a sum less than what was due"); *see also Guy F. Atkinson Co. v. Commissioner of Internal Revenue Service,* 814 F.2d 1388, 1393 (9th Cir.1987) (explaining that the requirements for a proper tender include, among others things " 'an unconditional offer to perform, coupled with a manifested ability to carry out the offer[,] ... [a] production of the subject matter of the contract ... [and] [t]he property tendered must not be less than what is due' " (quoting 15 S. Williston, Williston on Contracts § 1810 at 421–22)), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988).

**23.** The Defendants additionally contend in their briefs that Stanton's motion for partial summary judgment is premature because of a lack of or incomplete discovery. Opp. Brief at 17 ("[P]artial summary judgment is premature. Discovered has not yet commenced...."); Defendants' Reply Brief at 10 ("[P]artial summary judgment on the purchase-merger issue should be denied on the additional ground that discovery ... is not yet completed."). Rule 56(f) of the Federal Rules of Civil Procedure sets forth the procedure to be followed if a party contends it needs more time for discovery:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for the reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

This rule "explicitly provides that the party must file an affidavit setting forth why the time is needed[,]" and failure to do so "is usually fatal." *Pastore,* 24 F.3d at 510–11. A Rule 56(f) affidavit must contain " 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.' " *Id.* at 511 (quoting *Dowling v. City of Philadelphia,* 855 F.2d 136, 140 (3d Cir.1988)).

Defendants have not filed an affidavit in compliance with the requirements of Rule 56(f), as articulated by the Circuit. The only support for Defendants' contention, that they need more time for discovery, are the conclusory allegations in their briefs, as quoted above, of the premature nature of the instant motion in light of incomplete discovery.

Accordingly, Defendants have not made the necessary showing that they are incapable of "present[ing] by affidavit facts essential to justify [Defendants'] opposition...." Fed.R.Civ.P. 56(f); *see also Pastore,* 24 F.3d at 511 ("Such an amorphous allegation fails to explain what [Defendants] expect[ ] to discover, how it applie[s] to [the instant motion], and why they could not obtain that information elsewhere.").

**24.** In light of Stanton's success on his breach of contract claims, and his entitlement to only a single recovery of the finder's fees, it appears the only issue remaining in the instant action is Stanton's claim for $100,000.00 in punitive damages, pursuant to his fraud claim in Claim Eleven of the Complaint. Complaint, ¶¶ 70–75.

dants' for partial summary judgment is denied.